608 A.2d 304

JOHN MICHAEL JACOBER, AN INFANT, BY HIS GUARDIANS AD LITEM JOHN AND MARILYNN JACOBER, AND JOHN AND MARILYNN JACOBER, INDIVIDUALLY, PLAINTIFFS–APPEL-LANTS, v. ST. PETER'S MEDICAL CENTER, PHILOMENA DIAS, M.D., MARIA FORT, M.D., STEVEN FELD, M.D., AND ROBERT SIMON, M.D., DEFENDANTS–RESPONDENTS.

Argued February 3, 1992—Decided July 8, 1992.

476

*Roger A. Lowenstein* argued the cause for appellants (*Donald M. Friedman,* attorney).

*Jay Scott MacNeill* argued the cause for respondents Philomena Dias, M.D., and Maria Fort, M.D. (*Murray, MacNeill & Tafaro,* attorneys; *Jay Bently Bohn,* on the brief).

*Herbert Kruttschnitt, III,* argued the cause for respondent Steven Feld, M.D. (*Grossman & Kruttschnitt,* attorneys; *Eli L. Eytan,* on the brief).

*John J. McDermott, III* argued the cause for respondents St. Peter's Medical Center and Robert Simon, M.D. (*Richard A. Amdur,* attorney).

The opinion of the Court was delivered by

STEIN, J.

In *Ruth v. Fenchel,* 21 *N.J.* 171, 121 *A.*2d 373 (1956), we held that learned treatises may be admitted for impeachment purposes on cross-examination if the expert witness acknowledges them as recognized and standard authorities in the field. In this medical malpractice case, the defense experts acknowledged the reliability of plaintiffs' proffered medical texts but refused to state that those texts were authoritative. Relying on *Ruth,* the trial court prevented plaintiffs from using medical literature to rebut the defense experts' testimony. We conclude that the defense experts implicitly conceded the author-

itativeness of the proffered learned treatises and that those treatises were admissible under the *Ruth* standard.

We also hold that *Ruth*'s restrictions on the use of learned treatises interfere with the adversarial and truth-seeking aspects of trial. Thus, we adopt a new learned-treatise rule that mirrors the federal rule, permitting a text to be qualified as a learned treatise by expert testimony or by judicial notice rather than solely by the cross-examined expert. Moreover, the contents of learned treatises may be introduced as substantive evidence by experts on both direct and cross examination.

I

Plaintiff John Michael Jacober was born prematurely at St. Peter's Medical Center on November 27, 1981, after only twenty-five to twenty-eight weeks in gestation. In 1981, a newborn of Jacober's prematurity had a survival rate between ten and twenty-one percent. At birth, Jacober weighed approximately 730 grams (one pound ten ounces).

In order to monitor Jacober's blood pressure and blood gases, defendants decided to insert a catheter into his aorta through an umbilical artery. The nurse prepared two surgical trays, one with a 3.5 French catheter (3.5 catheter) and the other with a larger 5.0 French catheter (5.0 catheter). According to the nurse's notes, Dr. Philomena Dias, a first-year intern, inserted the 5.0 catheter into Jacober's umbilical artery but removed it when Jacober's right leg became "white and blanched," indicating circulatory problems. Defendant Dr. Maria Fort, a third-year resident, then performed another umbilical catheterization employing the same-sized catheter. When Jacober's right leg turned "dusky," the catheter was again withdrawn. Dr. Robert Simon, a Fellow in Neonatology, was present during the second catheterization. When Dr. Simon performed a third catheterization and the same leg darkened, the doctors abandoned the procedure and employed alternative monitoring techniques.

After that third catheterization, Jacober's right leg suffered from diminished circulation. As a result, the right toes auto-amputated from dry gangrene and thereafter the right leg grew unevenly. When he was ten years old, Jacober's right leg was misshapen and six inches shorter than the left leg. One doctor projected a twelve-inch discrepancy in the length of Jacober's legs by the time he is full-grown, a condition that may require amputation.

Jacober brought the present medical malpractice suit by his guardians *ad litem* against St. Peter's Medical Center and Doctors Dias, Fort, Feld, and Simon. At trial, Jacober set forth three grounds for liability: (1) Dr. Steven Feld, the obstetrician who had delivered Jacober, had failed to ensure that the hospital's senior neonatologist was present during the catheterizations; (2) Doctors Dias, Fort, and Simon had acted negligently in using the larger 5.0 catheter; and (3) Doctors Fort and Simon had repeated the umbilical catheterization despite Jacober's adverse reaction to the procedure.

Jacober's expert, Dr. Ronald E. Hoekstra, testified that defendants had deviated from the accepted standards of medical care by using the larger 5.0 catheter despite Jacober's low birth weight. He explained that larger catheters generally pose a greater risk of vasospasm (constriction) and thromboses (blood clots), either of which can block blood flow to an extremity. He also testified that defendants erred by attempting two more catheterizations after the first one had failed.

Defendants Dias and Fort presented Dr. Peter Auld as an expert in neonatology and pediatrics. Auld testified that a physician performing an umbilical catheterization should use "the biggest catheter possible" because "[i]f you put in too small a catheter it clots all the time, and it's a pain, and you can't use it." He stated that a 3.5 catheter "would have been less desirable" than the 5.0 catheter used.

Defendant Dr. Simon testified that the appropriate size of the catheter depends not on the infant's weight but rather on the

size of the infant's umbilical blood vessels. He also stated, as had Dr. Auld, that doctors should use the largest catheter possible. Although Dr. Simon could not recall performing the third catheterization or the size of the catheter used, he denied that he would have inserted the catheter if Jacober's leg had displayed any signs of circulatory complication.

Dr. Lawrence Skolnick testified as an expert in pediatrics and neonatology on behalf of defendant Simon. He stated that Dr. Simon had not deviated from the standards of the medical profession by performing a third catheterization with a 5.0 catheter. He also stated that "[y]ou basically put in the largest catheter that the artery will accommodate." He noted that the 5.0 catheter is less likely to clot. Moreover, he emphasized that Jacober's injury was not related to the size of the catheter, but rather to the fact that his artery remained in spasm even after the catheter had been removed.

Although defendants Fort and Dias did not testify at trial, both sides read into the record portions of their depositions. In her deposition, Dias testified that she did not recall what size catheter she had used on Jacober. Dr. Dias also acknowledged that it was "textbook" procedure at the hospital to have a 3.5 catheter on a tray for infants weighing less than 1500 grams. She also admitted that the 3.5 catheter would be the proper catheter to use on infants of Jacober's size.

In the course of trial, plaintiffs' counsel attempted to use medical literature in various ways to support the claim that the larger 5.0 catheter had caused Jacober's injury. Counsel sought to introduce Klaus and Fanaroff's medical manual, partly because Dr. Dias had asserted that that text informed the hospital's practice of using 3.5 catheters on infants weighing less than 1500 grams. In that text, the authors state that umbilical catheterization should be performed with "[a] 3.5 (infants < 1500 gm.) or 5 French catheter with rounded tip." Marshall H. Klaus & Avroy A. Fanaroff, *Care of the High Risk Neonate* 16 (2d ed. 1979). Counsel also attempted to introduce

medical literature demonstrating a causal link between catheter size and medical injury. One of the proffered texts states that complications from umbilical catheterization "relate to trauma during insertion, the duration of catheterization, the size of the catheters used * * * ." Dr. L. Stanley James, "Emergencies in the Delivery Room," in *Neonatal–Perinatal Medicine* 128, 137 (Richard E. Behrman ed., 2d ed. 1977). The author also observes that blanching of the limb is "directly related to the relative size of the catheter in the aorta." *Id.* at 138. A journal article arrived at a similar conclusion:

There is no doubt about the value of intravascular catheterization for diagnosis and treatment, yet the procedure cannot be considered harmless. A variety of precautions should be taken to reduce the high incidence and the severity of the complications * * *. *Keeping the size of the catheter as small as practicable,* the duration of catheterization and the length of the inserted portion as short as possible, and manipulation infrequent should limit the degree and extent of trauma * * * .

[H. Joachim Wigger, et al., *Thromboses Due to Catheterization in Infants and Children,* 76 *The Journal of Pediatrics* 1, 10 (1970) (emphasis added).]

At the outset of trial, plaintiffs' counsel announced that his medical expert intended to testify that the medical literature reflects the nearly unanimous opinion that 3.5 catheters should be used on premature infants of Jacober's weight and that some of the literature relates catheter size to the risk of injury. Sustaining the defense's objections, the court ruled that "[i]t's my understanding of our law that you may not use medical literature to support the opinion of your expert." Moreover, the court held that it would permit medical literature to be introduced by plaintiffs' counsel only if a defense expert "agrees that some treatise is authoritative. And then you can question him about the contents."

Plaintiffs' counsel also attempted to use medical literature during cross-examination to impeach the defense experts, Dr. Auld and Dr. Skolnick, and defendant Dr. Simon. However, none of them declared the proffered medical texts authoritative. Plaintiffs' counsel first attempted to have Dr. Auld recognize the Klaus and Fanaroff text as authoritative so it could be admitted as a learned treatise.

Q. Am I right, Doctor, that what you are telling us is that you do not accept this textbook as one of the standard texts in the field of neonatology?

A. It's a standard text, but I don't think it's authoritative, if that's what you're getting at.

\* \* \* \* \* \* \* \*

Q. \* \* \* Do you accept your own writing as authoritative?

A. Only for me.

Q. So that, essentially, I gather what you're saying is that if I were to ask you if anything that was written in medical literature is authoritative on the subject in which it addresses, you would have to say no?

A. It depends what you mean by authoritative. If you mean this is the way it's supposed to be done—

Q. Generally accepted in the profession.

A. I don't believe that. I think those textbooks are one man's opinion. They're constantly revised, they're never up to date, and I don't believe that they're that type of authority. Medicine doesn't recognize authorities this way.

Q. \* \* \* Are you aware of any research article by researchers in the field, that have attempted to show whether or not larger catheters are more likely or less likely to cause a risk of thrombus or embolus in a high risk neonate?

A. No, I'm not.

Q. Do you know whether or not researchers have addressed the issue that connect catheter size to the likelihood of injury?

\* \* \* \* \* \* \* \*

A. No, they haven't.

\* \* \* \* \* \* \* \*

[At sidebar conference]

[PLAINTIFFS' COUNSEL]: I now plan to go into the medical articles that I ask that connect size of catheters and risk of injury. Because he has denied that there are any.

[DEFENSE COUNSEL]: He said he's not familiar with any.

[PLAINTIFFS' COUNSEL]: He said there are none.

[DEFENSE COUNSEL 2]: I object.

THE COURT: Unless he will say that he accepts those, one of the articles or more than one of those articles as being authoritative, then I don't think you can \* \* \* .

Plaintiffs' counsel also unsuccessfully attempted to get Dr. Auld to admit the authoritativeness of Behrman's text.

Q. And am I right that in forming your opinion and testifying here today, you are making no reference whatsoever to any medical literature?

A. That's correct.

> Q. Did you, yourself, write a chapter in this book entitled; [sic] Neonatal/Perinatal Medicine, Diseases of the Fetus and Infant, edited by Richard E. Behrman?
>
> A. Yes.
>
> Q. Do you accept this book as one of the standard and authoritative textbooks in the field?
>
> A. No.
>
> Q. Even though you, yourself, are an author in the first edition of this book?
>
> A. That's correct.

The court prevented plaintiffs' counsel from cross-examining Dr. Auld on the medical literature because Dr. Auld did not concede that those texts were authoritative.

On cross-examination, Dr. Simon refused to acknowledge the Klaus and Fanaroff text and the James article as authoritative. Similarly, Dr. Skolnick refused on cross-examination to label those treatises as authoritative. Asked whether Dr. James was a recognized authority in the field of neonatology, Dr. Skolnick stated that "[h]e's a very eminent neonatologist." In subsequent testimony, Dr. Skolnick refused to characterize Behrman's text as authoritative:

> Q. Do you know the book Neonatal/Perinatal Medicine edited by Dr. Behrman?
>
> A. I recognize it.
>
> Q. Do you recognize this as one of the standard treatises in the field?
>
> A. It's a standard textbook, yeah.
>
> * * * . * * * * *
>
> Q. By standard, Doctor, do you mean standard in that it is recognized in the field by other practitioners as an authoritative source for reference?
>
> A. Well, I don't think any textbook is really authoritative, it has a set of opinions that some * * * clinicians would agree with and others would be very controversial.
>
> * * * * * * * *
>
> A. * * * Authoritative sort of sounds to me as though it implies that one opinion is the correct opinion that's expressed in a particular book, and that's simply not the way that any textbook is written.

Dr. Skolnick also denied that the Klaus and Fanaroff text was authoritative. Thus, the court sustained defense objections to counsel's questioning of Dr. Simon and Dr. Skolnick about the

treatises because they refused to recognize those treatises as authoritative.

Plaintiffs' counsel also attempted to read that portion of Dr. Dias' deposition in which she admitted that the hospital's standard procedure of using 3.5 catheters on infants weighing less than 1500 grams was based on the Klaus and Fanaroff text:

> [PLAINTIFFS' COUNSEL]: This is the exception. This is the one time that a witness is allowed to talk about textbooks when she states that this is the procedure that she is following because it is standard or textbook procedure. The obvious inference is that she accepts it as authoritative. She is not going to apply a procedure that she says is standard and textbook [that] is not authoritative. * * * So when a witness is saying as a matter of fact not opinion, as a matter of fact what we did was to use a standard procedure and I follow up by saying whose standard, where do you get the standard and she says it is textbook, well, is there a particular textbook that you are following. Yes. It was Kaus [sic] and Fanaroff. She is not rendering an opinion within the treatise rule. She is saying, as a matter of fact, this is what we did at St. Peter's and we followed this particular textbook. By the way, this is classic rebuttal to Dr. Auld saying I don't find Klaus and Fanaroff to be authoritative. We have the actual doctors who are performing the procedure saying this is the textbook we followed.

> * * * * * * * *

> THE COURT: * * * If I recall the rule correctly, * * * the proper use of which or to which an authoritative textbook could be used would be to affect the credibility of the expert who accepts it as being authoritative. It does not come in as evidence in chief. It simply affects the credibility of Dr. Auld. * * * .

> I recognize the fact here that we have a defendant in the case saying that at St. Peter's a textbook standard was applied and identifying the textbook and a fair argument can be made from that that it was an authoritative textbook. But * * * whether Klaus and Fanaroff is an authoritative textbook comes into play only if Dr. Auld and Dr. Skolnick agree that it is.

> * * * [T]he mere fact that Dr. Dias says it is authoritative or implies it is authoritative doesn't make even that fact admissible in evidence.

The court allowed plaintiffs' counsel to read an excerpt from Dr. Dias' deposition in which she acknowledged that it was "textbook" procedure to use the 3.5 catheter on infants of Jacober's size, but excluded Dr. Dias' reference to the Klaus and Fanaroff text.

Also, the court ruled that no party could refer to medical literature as support for its position in closing arguments.

Plaintiffs' counsel then sought to refer to the defense experts' refusal to recognize medical literature. After the court rejected that request, the following colloquy ensued:

[PLAINTIFFS' COUNSEL:] Here you have a man [Dr. Auld] who wrote 125 articles in an attempt to influence * * * the field who says that nothing is authoritative.

If I cannot point out that this is a man who found nothing to be authoritative, even his own, I am now seriously handicapped in my ability to argue to the jury that there are differences between and among these witnesses.

*　　*　　*　　*　　*　　*　　*　　*

THE COURT: * * * Again, I appreciate your frustration, but this is not something of my doing. If I were God, the rule would be different, [counsel], and I am not God.

Let me tell you that the plaintiffs' ox is gored on one occasion and the defendants' ox is gored on another occasion.

*　　*　　*　　*　　*　　*　　*　　*

[DEFENSE COUNSEL:] Can I say for the record briefly if [plaintiffs' counsel] takes this issue up on appeal, that *although I will oppose it in this particular case* * * * that *prospectively I hope they change the law;* because it will be much better for defendants who will have access to many more publications, libraries and textbooks; and it will be, as you say, something that will be beneficial to both sides, depending on what happens here. [Emphasis added.]

The jury returned a verdict in favor of all defendants. In answers to written interrogatories, the jury indicated that it found that Doctors Dias, Fort, and Simon did not deviate from generally-accepted medical standards in their use of a 5.0 catheter. Plaintiffs appealed on several grounds, alleging that among other things the court had erred in (1) refusing to permit plaintiffs' expert to testify that his opinion was based on the prevailing literature; (2) refusing to permit plaintiffs' counsel to examine defendants' experts pursuant to the learned-treatise rule; and (3) limiting counsel's comments in summation by precluding reference to medical literature. The Appellate Division affirmed in an unpublished opinion. We granted plaintiffs' petition for certification. 126 *N.J.* 386, 599 *A.*2d 162 (1991).

## II

The primary issue is the extent to which statements from learned treatises may be used in cross-examination of defense and expert witnesses. Our cases hold that learned treatises are inadmissible hearsay when offered to prove the truth of the matter asserted therein because the author's out-of-court statements are not subject to cross-examination. *Ruth, supra,* 21 *N.J.* at 176, 121 *A.*2d 373; *Kingsley v. Delaware, Lackawanna & Western R.R.,* 81 *N.J.L.* 536, 80 *A.* 327 (Sup.Ct.1911); *New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co.,* 59 *N.J.L.* 189, 35 *A.* 915 (Sup.Ct.1896). Although inadmissible as substantive evidence, learned treatises may be used to impeach the credibility of witnesses on cross-examination. Initially, courts limited the use of learned treatises to those instances "when a witness refers to them as an authority for his own opinions." *State v. MacRorie,* 86 *N.J.L.* 401, 405, 92 *A.* 578 (Sup.Ct.1914). This Court subsequently extended the learned-treatise doctrine to cases in which expert witnesses recognize a treatise as authoritative even if they do not rely on it in forming their opinions. *Ruth, supra,* 21 *N.J.* at 179, 121 *A.*2d 373. Writing for this Court in *Ruth,* Justice Brennan observed that

> where * * * the cross-examiner directs the attention of the expert witness to the contents of treatises expressing an opinion at variance with the opinion of the witness, and does so, not to prove the contrary opinion but merely to call into question the weight to be attached by the fact finder to the opinion of the witness, the law of this State allows such use of the treatise even if not relied upon by the witness in arriving at his opinion, *provided the witness admits that the treatise is a recognized and standard authority on the subject.* [*Id.* at 176, 121 *A.*2d 373 (emphasis added).]

In *Ruth,* one expert witness had "characterized the Key and Conwell treatise as 'an excellent textbook,' 'one of the textbooks I have in my library.'" *Id.* at 174, 121 *A.*2d 373. The other expert, asked whether he recognized the Key and Conwell treatise, had responded, "'Yes, they are very, very capable.'" *Id.* at 173, 121 *A.*2d 373. The Court held that both experts could be cross-examined on the Key and Conwell treatise. Thus, *Ruth* allows the admission of a learned treatise's state-

ments whenever a cross-examined expert acknowledges the treatise's scholarly merits.

In subsequent decisions, most courts have construed *Ruth* narrowly, requiring the witness expressly to declare the learned treatise authoritative before admitting its contents. In *Swank v. Halivopoulos,* 108 *N.J.Super.* 120, 260 *A.*2d 240 (App.Div. 1969), *certif. denied,* 55 *N.J.* 444, 262 *A.*2d 699 (1970), the plaintiff's counsel sought to cross-examine the defendant's medical expert about the standard of care for administration of oxygen to premature infants by reference to the "Standards and Recommendations of the American Academy of Pediatrics." However, the defense expert stated that he was unfamiliar with the book and that he did not recognize it as authoritative. The Appellate Division held that the text had been properly excluded because the defense expert had never acknowledged its authoritativeness. *Id.* at 125, 260 *A.*2d 240. Recently, the Appellate Division affirmed a trial court's refusal to allow the use of a highway-test report during an expert's cross-examination because the expert had not conceded the report's authoritativeness. *Crispin v. Volkswagenwerk A.G.,* 248 *N.J.Super.* 540, 551–52, 591 *A.*2d 966, *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991). Although the court noted that the learned-treatise doctrine is "unduly restrictive," it nonetheless reaffirmed the doctrine: a learned treatise "may be used to attack an expert's credibility only if the witness admits that the document constitutes a recognized standard authority on the subject involved." *Id.* at 552, 591 *A.*2d 966.

In the present case, both the trial court and Appellate Division held that *Ruth* prevented plaintiffs' counsel from cross-examining defense experts about the medical literature. Although Auld and Skolnick refused to declare the proffered texts "authoritative," they implicitly conceded as much. Auld admitted that the Klaus and Fanaroff book was "a standard text," and Skolnick acknowledged Dr. Stanley James as an "eminent neonatologist" who authored a "standard textbook."

Under *Ruth, supra,* those statements constituted sufficient acknowledgement that the texts are "recognized and standard authority on the subject." 21 *N.J.* at 176, 121 *A.*2d 373. Indeed, *Ruth* allowed the cross-examination of an expert witness who had stated merely that a treatise was "very, very capable." *Id.* at 173, 121 *A.*2d 373. *Ruth* requires an expert only to recognize a text as standard authority, not expressly to declare the text "authoritative." *See Eckleberry v. Kaiser Found. N. Hosps.,* 226 *Or.* 616, 359 *P.*2d 1090, 1093–94 (1961) (expert's admission that textbook was "commonly used" deemed sufficient to render the work authoritative).

Here, the trial court's exclusion of the statements from learned treatises precluded the jury from adequately assessing the defense experts' credibility. The medical literature that plaintiffs' counsel sought to use on cross-examination strongly supported plaintiffs' theory and challenged the defense experts' testimony. Also, the trial court did not permit the jury to hear Dr. Dias' admission in her deposition that the Klaus and Fanaroff text informed her view that 3.5 catheters should be used on newborns weighing less than 1500 grams. In addition, the trial court prevented plaintiffs' counsel from referring to any medical articles in order to rebut Dr. Auld's factual assertion that no medical literature connects catheter size to the risk of injury. In that instance, the court's ruling forced the jury to resolve the issue regarding the state of the medical literature on grounds of credibility rather than by reference to objective facts.

III

Plaintiffs do not argue for reversal solely on the ground that the trial court misapplied *Ruth.* Rather, plaintiffs contend that our learned-treatise doctrine should be modified because it enables defense experts to stymie cross-examination merely by refusing to concede that learned treatises are recognized and standard authorities. At trial, and at oral argument before us,

plaintiffs' counsel and counsel for one defendant advocated an expansion of the learned-treatise doctrine (although defense counsel argued that the current doctrine be applied to this case). Thus, we consider that contention as an alternative ground for our decision.

The Federal Rules of Evidence (FRE) offer a more expansive rule governing the admission of learned treatises. FRE 803 states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * * * * * * *
>
> (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

A majority of states have adopted the federal learned-treatise rule or follow an analogous rule. *See Ariz.R.Evid.* 803(18) (1991); *Ark.R.Evid.* 803(18) (1991); *Colo.R.Evid.* 803(18) (1992); *Del.Unif.R.Evid.* 803(18) (1991); *Hawaii R.Evid.* 803(b)(18) (1991); *Idaho R.Evid.* 803(18) (1991); *Iowa R.Evid.* 803(18) (1991); *Kan.Stat.Ann.* § 60–460(cc) (1991); *Ky.Rev.Stat.Ann.* § 422A.0803(18) (1991); *La. Code Evid.Ann.* art. 803(18) (1991); *Me.R.Evid.* 803(18) (1991); *Minn.R.Evid.* 803(18) (1992); *Mont. R.Evid.* 803(18) (1991); *Nev.Rev.Stat.Ann.* § 51.255 (Michie 1991); *N.H.R.Evid.* 803(18) (1991); *N.M.R.Evid.* 11–803 R (1991); *N.C.Gen.Stat.* § 8C–1, Rule 803(18) (1991); *Okla. Stat.Ann.* tit. 12, § 2803(18) (West 1991); *S.D.Codified Laws Ann.* § 19–16–22 (1991); *Tex.R.Civ.Evid.* 803(18) (1991); *Utah R.Evid.* 803(18) (1991); *Vt.R.Evid.* 803(18) (1991); *Wash. R.Evid.* 803(a)(18) (1991); *W.Va.R.Evid.* 803(18) (1991); *Wis. Stat.Ann.* § 908.03(18) (West 1991); *see also Cross v. Huttenlocher*, 185 *Conn.* 390, 440 *A.*2d 952, 955–56 (1981).

FRE 803(18) differs from our learned-treatise doctrine in several respects. First, the federal rule allows texts to be

established as reliable authority by experts other than the cross-examined expert, as well as by judicial notice. Secondly, expert witnesses may refer to statements from learned treatises on direct examination, to the extent that they relied on those statements in forming their own opinion. Finally, the contents of learned treatises may be introduced as substantive evidence on both direct and cross-examination.

FRE 803(18) expands the use of learned treatises on cross-examination by not requiring cross-examined witnesses to recognize treatises as authoritative. In that manner, the rule "avoid[s] the possibility that the expert may at the outset block cross-examination by refusing to concede reliance or authoritativeness." *Fed.R.Evid.* 803(18) advisory committee's note. One state court has recognized the danger that an expert

> need only say that he is not acquainted with the book or its author to prevent its use in testing his qualifications, no matter how eminent or accepted the author may be. The fewer books and authorities the witness knows about or will acknowledge and the less knowledge he has of what has been written in the field, the more difficult it will be to cross-examine him along this line. It gives him full veto power over the cross-examiner's efforts.
>
> [*Whitley v. Stein*, 34 *S.W.*2d 998, 1001 (Mo.App.1931).]

In a similar vein, the Illinois Supreme Court observed that "[t]o prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness." *Darling v. Charleston Community Memorial Hosp.*, 33 *Ill.*2d 326, 211 *N.E.*2d 253, 259 (1965), *cert. denied*, 383 *U.S.* 946, 86 *S.Ct.* 1204, 16 *L.Ed.*2d 209 (1966). Consequently, several state courts permit cross-examiners to establish the authority of learned treatises through judicial notice or through the testimony of other expert witnesses. *See, e.g., Darling, supra*, 33 *Ill.*2d 326, 211 *N.E.*2d 253; *Jones v. Bloom*, 388 *Mich.* 98, 200 *N.W.*2d 196 (1972); *Iverson v. Lancaster*, 158 *N.W.*2d 507, 517–18 (N.D.1968); *Dabroe v. Rhodes Co.*, 64 *Wash.*2d 431, 392 *P.*2d 317, 321–23 (1964); *Thornton v. CAMC, ETC.*, 172 *W.Va.* 360, 305 *S.E.*2d 316, 321–23 (1983).

The federal rule, unlike the *Ruth* doctrine, allows experts to refer on direct examination to statements from learned treatis-

es if they relied on those treatises in forming their opinions. That position is consistent with the federal rules' overall expansion of admissible expert testimony. Discussing FRE 703, which permits experts to base their direct testimony on reliable but inadmissible evidence, the Fifth Circuit has observed that "otherwise hearsay evidence that reveals the underlying sources of the expert's opinion should be as permissible on cross-examination as on direct." *Bryan v. John Bean Div. of FMC Corp.*, 566 *F*.2d 541, 545 (5th Cir.1978).

In contrast to the *Ruth* doctrine, FRE 803(18) permits learned-treatise statements to be admitted as substantive evidence on both direct and cross-examination. The rationale for that approach is largely pragmatic: "the rule avoids the unreality of admitting evidence for the purpose of impeachment only, with an instruction to the jury not to consider it otherwise." *Fed.R.Evid.* 803(18) advisory committee's note. Nevertheless, the rule "limit[s] the use of treatises as substantive evidence to situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired." *Ibid.* The rule's emphasis on expert guidance, as well as its prohibition on the receipt of learned treatises as exhibits, limits the risk that factfinders will misunderstand or misapply learned-treatise statements and discourages the use of learned treatises as substitutes for expert testimony.

The federal courts have explicated how learned-treatise statements may be introduced into evidence. FRE 803(18) requires an expert witness to lay a proper foundation for the reliability and authoritativeness of a text before its contents can be admitted as a learned treatise. *Schneider v. Revici*, 817 *F*.2d 987 (2d Cir.1987); *see Tart v. McGann*, 697 *F*.2d 75, 78 (2nd Cir.1982); *Hemingway v. Ochsner Clinic*, 608 *F*.2d 1040, 1047 (5th Cir.1979). Mere publication does not automatically render a text a reliable authority. *Meschino v. North Am. Drager, Inc.*, 841 *F*.2d 429, 434 (1st Cir.1988). However, an expert can demonstrate a text's authoritativeness by testifying that professionals in the field regard the text as trustworthy. *See, e.g.,*

*Schneider, supra,* 817 *F.*2d 987 (upholding exclusion of phy-
siopathology text when counsel repeatedly failed to ask expert
whether book was recognized as authoritative in medical pro-
fession); *see also Dawson v. Chrysler Corp.,* 630 *F.*2d 950,
960–61 (3d Cir.1980) (concluding that defense experts inferen-
tially conceded authoritativeness of reports on cross-examina-
tion), *cert. denied,* 450 *U.S.* 959, 101 *S.Ct.* 1418, 67 *L.Ed.*2d 383
(1981). In *Allen v. Safeco,* 782 *F.*2d 1517, 1519–20 (1986), the
Eleventh Circuit held that an arson expert had provided a
sufficient foundation for a magazine article's admission in
evidence by testifying that he relied on the magazine to keep
abreast of developments in fire-scene investigation and analy-
sis, that the magazine's articles were generally considered
"somewhat authoritative," and that the author had a good
reputation in the field.

Federal courts have admitted learned-treatise evidence in a
variety of contexts. *See, e.g., Johnson v. Ellis & Sons Iron
Works,* 609 *F.*2d 820, 822–23 (5th Cir.1980) (discussing admis-
sion of safety codes and standards); *Maggipinto v. Reichman,*
607 *F.*2d 621, 622 (3d Cir.) (discussing admission of statements
from medical texts), *on remand,* 481 *F.Supp.* 547 (E.D.Pa.
1979); *United States v. Mangan,* 575 *F.*2d 32, 48 (2d Cir.)
(discussing admission of charts on handwriting characteristics),
*cert. denied,* 439 *U.S.* 931, 99 *S.Ct.* 320, 58 *L.Ed.*2d 324 (1978);
*see also* 11 James W. Moore, *et al., Moore's Federal Practice*
§ 803(18)[3] (1989) (listing cases applying FRE 803(18)). Al-
though a text qualifies as a learned treatise under FRE 803(18),
it may be excluded from evidence if the danger of prejudice
outweighs its probative value. *See Schneider, supra,* 817 *F.*2d
at 991 (noting that learned treatises authored by medical-
malpractice defendants should normally be excluded as preju-
dicial); *Ellis v. International Playtex, Inc.,* 745 *F.*2d 292, 305–
06 (4th Cir.1984) (holding that trial court did not abuse discre-
tion by excluding medical article that discussed results of study
on tampon use because study did not indicate type of tampon

used by subjects and because there was no evidence that plaintiff had suffered injuries identified by study).

IV

The Evidence Act, *L.* 1960, *c.* 52, provides a statutory mechanism for adopting new or revised rules of evidence. *See N.J.S.A.* 2A:84A–33 to –49; *State v. D.R.,* 109 *N.J.* 348, 374–76, 537 *A.*2d 667 (1988); *Busik v. Levine,* 63 *N.J.* 351, 367–68, 307 *A.*2d 571 (1973). Last year, the Supreme Court Committee on the Rules of Evidence proposed a new learned-treatise rule that "follows *Fed.R.R.Evid.* 803(18) almost verbatim." 129 *N.J.L.J.* Supp. 1, 39, 34 (October 10, 1991). We recently considered the draft of that new rule at a Judicial Conference, pursuant to *N.J.S.A.* 2A:84A–34. Under the statutory mechanism, the new evidence rule, if approved, would be publicly announced on September 15, 1992, and concurrently delivered to the President of the Senate, Speaker of the General Assembly, and the Governor, *N.J.S.A.* 2A:84A–35, and then become effective July 1, 1993, unless cancelled by a joint resolution of the Senate and Assembly signed by the Governor, *N.J.S.A.* 2A:84A–36. To date, we have followed the statutory provisions for adopting a new learned-treatise rule. However, this case invites us to consider immediate adoption of FRE 803(18).

■ Although the Evidence Act provides the usual mechanism for adopting new rules, certain areas of evidence law "will continue to develop on a case-by-case decisional basis." V. Biunno, *Current N.J. Rules of Evidence,* Preliminary Comments at xvii (1991). The learned-treatise doctrine, a creation of our common law not yet codified in the Rules of Evidence, is open to judicial modification to the extent necessary to promote the truth-seeking function of trials. As *Evidence Rule* 5 provides:

> The adoption of these [promulgated] rules shall not bar the growth and development of the law of evidence in accordance with fundamental principles to the end that the truth may be fairly ascertained.

In *State v. D.R.*, *supra*, 109 *N.J.* at 374–76, 537 *A.*2d 667, we declined to adopt a new hearsay-rule exception for out-of-court statements by sexually-abused children. Resting our decision on considerations of comity between the various branches of government rather than on constitutional interpretation, we held that that rule should be adopted pursuant to the statutory procedure. However, we did not foreclose the possibility of fashioning new evidence rules on a unilateral basis: "We need not and do not intend in this opinion to attempt to probe the outer limits of the judiciary's power to modify or adopt rules of evidence." *Id.* at 375, 537 *A.*2d 667. Here, we are modifying a pre-existing common-law rule of evidence, not establishing a new rule. *See State v. Hill*, 121 *N.J.* 150, 166, 578 *A.*2d 370 (1990) (altering common-law rule governing admission of fresh-complaint evidence in rape trials). Nor does modifying the learned-treatise rule pose as "serious and far-reaching" consequences as the rule considered in *D.R.* *Ibid.* Thus, we conclude that the legislative scheme is flexible enough to accommodate judicial modification of the common-law learned-treatise doctrine.

 This case presents a compelling context for adoption of the federal learned-treatise rule. Even remanding this case for retrial under the correct application of *Ruth* may not prevent the defense experts from blocking cross-examination by refusing to acknowledge plaintiffs' proffered medical texts as recognized and standard authorities.

Adoption of the federal rule will advance the goals of the adversarial system by enhancing the ability of juries to evaluate expert testimony. The *Ruth* doctrine inhibits the factfinder from assessing the credibility of an expert's opinion by reference to that opinion's support in the relevant literature. As early as 1949, the Supreme Court recognized that juries should not be insulated from the literature that experts use in formulating their opinions: "It certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such

evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books." *Reilly v. Pinkus*, 338 *U.S.* 269, 275, 70 *S.Ct.* 110, 113, 94 *L.Ed.* 63, 70 (1949). The late professor Wigmore long advocated the greater use of learned treatises at trial, contending that "those who write with no view to litigation are at least as trustworthy, though unsworn and unexamined, as perhaps the greater portion of those who take the stand for a fee from one of the litigants." 6 *Wigmore on Evidence*, § 1692, at 7 (Chadbourn rev.1976). Moreover, an opinion must ordinarily satisfy a certain level of reliability in order to find its way into publication, and once published, a text is open to ongoing scrutiny, criticism, and revision by other members of that discipline.

In addition, the federal rule will help equalize resources among parties, permitting a party with less access to expert witnesses to advance an argument before a jury based on opinions set forth in learned treatises. *See Ruth v. Fenchel*, 37 *N.J.Super.* 295, 309, 117 *A.*2d 284 (App.Div.1955) (criticizing limitations on the learned-treatise doctrine in part because "[t]he side [that] can afford and is able to produce medical experts of sufficient stature and, perhaps, in greater number, has the distinct advantage."), *aff'd, Ruth, supra*, 21 *N.J.* 171, 121 *A.*2d 373; *Wigmore, supra*, § 1691, at 6. For those reasons, we now adopt FRE 803(18) as our new state rule governing the admission of learned-treatise statements at trial.

■■ Under that new learned-treatise rule, a text will qualify as a "reliable authority" if it represents the type of material reasonably relied on by experts in the field. *See Evid.R.* 56(2); *Rubanick v. Witco Chemical Corp.*, 125 *N.J.* 421, 449–53, 593 *A.*2d 733 (1991); *Ryan v. KDI Sylvan Pools, Inc.*, 121 *N.J.* 276, 287, 579 *A.*2d 1241 (1990); *cf. McComish v. DeSoi*, 42 *N.J.* 274, 282, 200 *A.*2d 116 (1964) (safety codes are admissible as substantive evidence when they reflect generally-recognized industry standards). Recently, we noted that in determining reliability "[t]he focus should be on what the experts in fact rely on,

not on whether the court thinks they should so rely." *Ryan, supra,* 121 *N.J.* at 289, 579 *A.*2d 1241. When a text's reliability is in doubt, trial courts should conduct *Rule* 8 hearings, either before or during trial, to determine whether the text qualifies as a learned treatise. Trial courts will also be expected to exercise discretion to prevent juries from being inundated with learned treatises. However, we do not anticipate that the new rule will lead to the "battle of the books" predicted by defendants. Indeed, plaintiffs in this case sought to use only one text and two articles in cross-examining the defense experts despite the defense's uncontested assertion that fifty-three textbooks and articles express views on the subject of umbilical catheterization. Attorneys have a strong incentive to focus the factfinder's attention on the most reputable and most comprehensible learned treatises that support their positions rather than to overwhelm the factfinder with references to as many treatises as possible.

The new learned-treatise rule also allows experts to introduce learned-treatise statements on direct examination if they relied on them in forming their opinions. Although that practice marks a sharp break with *Ruth,* it is consistent with the liberalized approach to expert testimony reflected by the amendment of *Evidence Rule* 56(2) in 1982. Under that rule, experts can testify about an opinion based on inadmissible facts or data "[i]f of a type reasonably relied upon by experts in the particular field in forming their opinions or inferences upon the subject." Pursuant to *Evidence Rule* 56(2), our courts have permitted experts to testify about statistical evidence they relied on if the evidence is adjudged sufficiently reliable. *See State v. Harvey,* 121 *N.J.* 407, 431, 581 *A.*2d 483 (1990) (on retrial State expert who relied on *Source Book of Forensic Serology* could testify regarding the percentage of blacks with a certain genetic marker in their blood type if the "State can show that that book and figure are considered authoritative in the forensic-serology community"), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991); *Mauro v. Owens–*

*Corning Fiberglas,* 225 *N.J.Super.* 196, 206, 542 *A.*2d 16 (App. Div.1988) (expert could testify about statistical data " 'of a type reasonably relied upon by experts' in the field of pulmonary disorder"), *aff'd sub nom. Mauro v. Raymark Indus.,* 116 *N.J.* 126, 561 *A.*2d 257 (1989).

■ In this case, plaintiffs' counsel requested that his expert be permitted to testify on direct examination "that the medical literature is virtually unanimous that in a less than 1500 gram infant, a three point five catheter is the appropriate size, and not a five * * * [and] that the medical literature which he subscribes to and relies on, says that catheter size is related to the risk of injury." The trial court ruled that the learned-treatise doctrine precluded plaintiffs' expert from supporting his opinion by reference to medical literature. Affirming that ruling, the Appellate Division held that hearsay evidence on the ultimate issue to be resolved at trial is not permitted by *Evidence Rule* 56(2). By contrast, several courts have held that hearsay opinion on such an issue is admissible as long as that opinion is reliable. *See, e.g., Bryan, supra,* 566 *F.*2d at 545; *Long v. U.S.,* 59 *F.*2d 602 (4th Cir.1932); *Mauro, supra,* 225 *N.J.Super.* at 205–06, 542 *A.*2d 16. Moreover, experts can offer reliable opinion testimony about the ultimate issue at trial. *Evid.R.* 56(3); *State v. Odom,* 116 *N.J.* 65, 79, 560 *A.*2d 1198 (1989); *State v. Perez,* 218 *N.J.Super.* 478, 483, 528 *A.*2d 56 (App.Div.1987); *State v. Louf,* 126 *N.J.Super.* 321, 344, 314 *A.*2d 376 (App.Div.), *aff'd in part and rev'd in part,* 64 *N.J.* 172, 313 *A.*2d 793 (1973); *State v. Boiardo,* 111 *N.J.Super.* 219, 238, 268 *A.*2d 55 (App.Div.), *certif. denied,* 57 *N.J.* 130, 270 *A.*2d 33 (1970), *cert. denied,* 401 *U.S.* 948, 91 *S.Ct.* 931, 28 *L.Ed.*2d 231 (1971); *Shutka v. Pennsylvania R.R.,* 74 *N.J.Super.* 381, 399–403, 181 *A.*2d 400 (App.Div.), *certif. denied,* 38 *N.J.* 183, 183 *A.*2d 88 (1962). Thus, we hold that experts can testify about learned-treatise opinions whether or not those opinions address the ultimate issue in the case.

We reverse the judgment of the Appellate Division and remand for a new trial on two grounds. First, the trial court and Appellate Division applied *Ruth* too restrictively by requiring the defense experts expressly to declare the texts authoritative before admitting those texts as learned treatises. Secondly, this case, by highlighting the pervasive problems with our present learned-treatise doctrine, prompts us to adopt FRE 803(18) as our new rule. Our holding that the federal rule governs the admission of learned treatises at trial will be applied prospectively, except for this case. *See Green v. Auerbach Chevrolet Corp.*, 127 *N.J.* 591, 606 *A.*2d 1093 (1992); *Accountemps v. Birch Tree Group*, 115 *N.J.* 614, 627–28, 560 *A.*2d 663 (1989); *Weinberg v. Dinger*, 106 *N.J.* 469, 496, 524 *A.*2d 366 (1987); *Darrow v. Hanover Township*, 58 *N.J.* 410, 420, 278 *A.*2d 200 (1971). On remand, the trial court should follow FRE 803(18) in resolving evidentiary issues concerning the use of proffered medical texts. In view of our decision to remand the case for retrial, we need not address plaintiffs' other arguments.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, STEIN, and GARIBALDI—7.

*Opposed*—None.