[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 260.]

FRESHWATER ET AL., APPELLANTS, *v.* SCHEIDT ET AL., APPELLEES.

[Cite as *Freshwater v. Scheidt*, 1999-Ohio-161.]

*Evidence—Expert witness—Reliance on published medical literature in forming opinion—Statements contained in literature can be used for purposes of impeachment—Reliance on published medical literature can be established without an express acknowledgement by the testifying expert that he or she relied upon it.*

If an expert witness relies upon published medical literature in forming his or her opinion, or the expert provides testimony sufficient to establish that the literature is reliable authority, or the literature is part of the expert's own publication, statements contained in the literature can be used for purposes of impeachment. The requisite reliance upon published medical literature or its authoritative nature can be established without an express acknowledgement by the testifying expert that he or she had relied upon the literature or that it is authoritative. (*Stinson v. England* [1994], 69 Ohio St.3d 451, 633 N.E.2d 532, construed and followed.)

(No. 97-1502—Submitted April 13, 1999—Decided September 1, 1999.)

APPEAL from the Court of Appeals for Paulding County, No. 11-96-10.

———————————

{¶ 1} In 1993, appellant Kathleen M. Freshwater was referred by her personal physician to appellee Dr. Robert B. Scheidt, a general surgeon, for chronic abdominal pain. Scheidt examined Kathleen and concluded that she would benefit from having her gallbladder removed. In a preoperative medical report, Scheidt noted that "[t]his 70 year old patient is having bouts of abdominal pain, increased gas and also nausea. The patient has had a gallbladder ultrasound which is negative but a hepatobiliary scan shows an ejection fraction with CCK stimulation of only

9%, this being abnormal[.] [W]e feel that the patient will benefit from a laparoscopic cholecystectomy. This has been thoroughly discussed with the patient and she is aware that there is a possibility this may not help and also that we may have to do additional conversion from laparoscopic technique to open technique for a successful surgery." In the report, Scheidt also set forth Kathleen's present physical condition, medications that she was taking, and her medical history. Kathleen had undergone numerous past surgeries. Her surgeries listed in the report included "[h]erniorrhaphy, cyst removed from ovaries, appendectomy, T & A and surgery for a 'twisted bowel,' D & C."

{¶ 2} On November 9, 1993, Kathleen underwent surgery at appellee Paulding County Hospital to remove her gallbladder. The laparoscopic cholecystectomy performed on Kathleen was referred to as a "closed" or "blind" technique, which involved the initial insertion of a "Veress" needle. In his postoperative report, Scheidt noted that the needle was inserted at the umbilicus, that it was followed by a trocar and camera, and that he was "lucky to get in avoiding bowel." Scheidt noted further that "[t]he bowel was adherent to the anterior parietal peritoneum along the scar line which was to the right of the umbilicus, but there was also some bowel surrounding the trochar and we could not visualize the gallbladder. We therefore * * * spent a considerable period of time taking down adhesions * * *. We inspected the bowel as we progressed and there was no injury to bowel wall. It was entirely intact when it was finally taken down. * * * We were able to insert the light lens [and] camera through the umbilical port and get a proper view of the gallbladder. * * * [T]he gallbladder was removed * * * and retrieved through the umbilical port."

{¶ 3} Shortly after surgery, Kathleen had noticeable swelling of her body and severe abdominal pain. Kathleen was eventually transported by ambulance to another hospital, where she underwent further surgery to repair a perforation to her small bowel. The perforation occurred as a result of the laparoscopic procedure

performed by Scheidt. During this time, Kathleen became seriously ill and almost died. She was hospitalized for seventy-seven days, the majority of which was spent in the intensive-care unit. She also incurred extensive medical bills.

{¶ 4} On September 29, 1994, Kathleen and her husband, appellant Dewain Freshwater, filed a complaint against Scheidt, his incorporated medical practice, and Paulding County Hospital. Appellants alleged, among other things, that Scheidt was negligent in failing to inform Kathleen of the risks associated with the surgery, and that Scheidt was negligent in the performance of the operation itself. Appellants' claims against the hospital included claims predicated on the theory of agency by estoppel and the negligent credentialing of Scheidt. Dewain also sought recovery against appellees for loss of consortium.

{¶ 5} Prior to trial, appellants dismissed their negligence claims against the hospital. Additionally, the hospital entered an admission that Scheidt was an agent of the hospital by estoppel and that if Scheidt was found liable to appellants for malpractice, the hospital would be vicariously liable for his conduct.

{¶ 6} During the trial, testimony was presented that various surgical methods could be used in removing a patient's gallbladder. The methods utilized were classified generally as either open or closed procedures. In 1993, the closed laparoscopic procedure performed on Kathleen was a relatively new technique. From 1990 through 1992, Scheidt attended medical training courses in which he learned how to perform the laparoscopic cholecystectomy. He also learned when it was appropriate to use a laparoscopic procedure and contraindications that warranted the use of other surgical methods.

{¶ 7} At trial, appellants' counsel attempted to have Scheidt acknowledge the authoritative nature of his medical training in which he learned how to perform laparoscopic cholecystectomies. Counsel intended to demonstrate that Scheidt had been negligent in performing the laparoscopic cholecystectomy, that he had been aware of the risks and dangers associated with the procedure, and that, given

Kathleen's prior surgeries and the increased risk of underlying adhesions from the surgeries, Scheidt should have resorted to an alternative safer method of removing the gallbladder.[1]  On cross-examination, Scheidt was questioned as follows:

"Q.   And were the people who presented you with the training on laparoscopic surgery authorities in the field of laparoscopic surgery?

"A.   Well, they were the teachers.  I hardly know how to define authority.  Certainly what they had to say was helpful and useful.

"Q.   And you looked to them for guidance?

"A.   I looked to them for helpful suggestions.  I already knew how to do laparoscopic surgery.  I had done a lot of it before, but I was looking for any kind of clues or small ideas that could help me do good surgery from them.

"Q.   Okay.  And were the courses that you took  * * * for laparoscopic surgery for cholecystectomies   * * * courses that you used to determine laparascopic surgery and how to perform it?

"A.   They were certainly helpful to me.

"Q.   Okay.  And would you agree that  * * * Dr. Kulkin is an authority on laparoscopic surgery on the closed technique?

"A.   I don't remember him by name.  I couldn't answer that question.

"Q.   Okay.  Do you, you don't know that he's an authority or not?  Do you remember the course work?

"A.   I remember that I took the course.  I'm not sure I can specifically recall the course work, per se.  Many, many courses are combined in my mind.

"Q.   Okay.  So this person may not be authoritative, you may not have gotten

_____

1. Expert testimony elicited at trial indicated that adhesions can develop as a result of prior surgeries.  Adhesions can cause organs to stick together or cause organs such as the small bowel to stick to the underside of the abdominal cavity.  Counsel for appellants attempted to establish that Scheidt was aware that adhesions would be present, that the perforation to Kathleen's small bowel occurred during the blind insertion of the Veress needle or insertion of the trocar, and that Scheidt fell below the standard of acceptable medical care in performing the operation and by utilizing the closed procedure instead of an open technique in removing the gallbladder.

anything out of him?

"A.  I couldn't possibly say that.

"Q.  Okay.  Well, I'd like to ask you some questions about this to see if you agree with him or if you don't agree with him.

"A.  Fine.

"MR. RIEMENSCHNEIDER [DEFENSE COUNSEL]:  Your honor, I'm just going to object, hearsay."

{¶ 8} Subsequently, the following discussion took place between counsel for the litigants and the trial court:

"THE COURT:  The record should reflect that counsel and the court and Dr. Scheidt are present in the courtroom out of the presence of the jury.  There were several evidentiary issues that needed to be addressed on the record here.

"First, let's start with the training manual issue.  Counsel wish to make any arguments on the record?

"MR. O'NEIL [COUNSEL FOR PLAINTIFFS]: Yes, Your Honor.  * * * Your Honor, we had identified the training manual that was provided to us in discovery. In fact, there is a cover sheet on the training manual  * * *.  It says, 'Enclosed are copies of the requested documentation provided by Dr. Scheidt in response to request for any course work and/or continuing education courses.  * * * '

"And in there is a course work from an advanced laparoscopic surgery for general surgery and another course study.  * * *

"Dr. Scheidt in his deposition indicated  * * * at, if I've got the right page, page 35, 'The procedure you went through on November 9, '93, is that the same procedure that you had learned on in these hands-on courses?'  'Yes.'

"And then, 'Had you made any alterations or changes in the manner of the procedure?'  He says, 'Yes'; and then the next line he changes that, and says, 'What changes have you made from the time of your training and the time of the laparoscopy on Mrs. Freshwater?'

" 'I'm sorry, I didn't understand your question. No I've made, I have not made any changes from my training.'

"Later on in the deposition, I asked him about authoritative sources on page 50; and I asked a question, 'The courses you took, whether it was hands-on or otherwise, is there anyone there who you considered an authority on laparoscopy that you can recall?'

"His answer was, 'I thought my teachers were good, I can't remember their names.'

"And so, Your Honor, I think that this is how he learned how to do what he does; and it should be able to [be] gone into by me for purposes of notice of how to do the procedures correctly, notice of potential harms, and if he did the procedure correctly.

" * * *

"THE COURT: Well, but you're talking about procedures, Joe, as opposed to all of the content in that training manual. It is going to be the ruling of the court that the training manual is not going to be admissible. I feel, it is my position that, again, that hearsay, you're wanting to admit it for the truth of the matter contained in that document and the correctness of that procedure; which, again, it may be correct, I don't know; but I think you need a witness here who can be cross-examined before you can get that evidence in."

{¶ 9} Also at trial, Dr. Karl A. Zucker, an expert witness for appellees, testified that Scheidt did not deviate from accepted standards of medical care in removing Kathleen's gallbladder. Upon cross-examination of Zucker, counsel for appellants attempted to question Zucker about statements contained in a book entitled "Surgical Laparoscopy," which had been edited and written in part by Zucker. The statements were in a chapter entitled "Open Laparoscopy," written in part by a colleague of Zucker's, Dr. Fitzgibbons. Additionally, appellants' counsel also sought to cross-examine Zucker with respect to other medical literature

authored by Fitzgibbons. This additional literature had apparently been referred to by Zucker in some of Zucker's other publications. When questioned about the writings that Fitzgibbons had authored, Zucker avoided answering whether Fitzgibbons was an "authority" in the field and he further refused to acknowledge whether the medical literature authored by Fitzgibbons was "authoritative" in nature:

"Q. When you have written articles on laparoscopic surgery, have you frequently cited Dr. Fitzgibbons as an authority on the open laparoscopic technique?

"A. I'm not sure the word 'authority' is one I'd use; but he's a colleague, a personal friend, my kids play with his kids. So he's a respected colleague, and I often will quote him. I think he's very honorable and honest individual with very good experience.

"Q. And you value his opinion?

"A. Yes.

"Q. And when you put out your book, he's the one who wrote the chapter with another doctor or two on open laparoscopic?

"A. Yes.

" * * *

"Q. * * * Doctor, I have — did you quote Dr. Fitzgibbons because you believed he was an authority in the area of open laparoscopic surgery?

"A. As I said, I'm not sure I used the word 'authority.'

"Q. Well, that's my question, though. It's of some legal significance as to the questions I can ask you or cannot ask you, and I'd like to know if you consider him an authority in the area of open laparoscopic surgery.

" * * *

"Q. * * * Have you relied upon Dr. Fitzgibbons at all in your profession of informing other doctors as to the open Hasson technique?

"A. I've quoted Dr. Fitzgibbons; but I don't always, you know, agree with his writing or what he advocates.

"Q. Did you rely upon, did you think he was authoritative enough to write a chapter in your book?

"A. Again, I'm not sure about the word 'authoritative,' but I value his opinion and his expertise. I invited him to write a chapter in a textbook that I wrote on laparoscopic surgery.

"Q. Did you rely upon the materials presented in that chapter of your book for any part of your testimony today?

"A. I certainly, I used part of that in coming up to my opinions and every day practice as well as in this testimony.

"Q. Did you rely upon his part of the chapter that dealt with complications and risk factors of not using the open technique?

" * * *

"Q. Did you rely upon any studies or statistics that he had as to the open Hasson technique versus the closed technique in coming to your conclusions for trial today?

"A. Well, as I said, I agree with some of the things and I disagree with other parts of his writings * * *."

{¶ 10} The trial court prevented counsel for appellants from cross-examining Zucker with respect to statements in Zucker's book. The trial court concluded that in accordance with *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, the medical literature could not be used to impeach the testimony of Zucker.

{¶ 11} On September 26, 1996, following trial, the jury returned a general verdict in favor of appellees. In response to interrogatories, the jury concluded that Scheidt had not been negligent in his care and treatment of Kathleen and that Scheidt had properly informed Kathleen of the risks and dangers associated with

8

the operation. On September 30, 1996, the trial court entered judgment for appellees.

**{¶ 12}** Appellants appealed to the Third District Court of Appeals, claiming that the trial court erred in restricting their use of medical literature in the cross-examination of Scheidt and Zucker. Relying in part on *Stinson*, *supra*, the court of appeals overruled appellants' assignments of error and affirmed the judgment of the trial court. The court of appeals held that because Scheidt and Zucker did not explicitly concede the "authoritative" nature of the literature in question, the literature could not be used by appellants for purposes of impeachment.

**{¶ 13}** The cause is now before this court upon the allowance of a discretionary appeal.

––––––––––––––––––

*Arthur, O'Neil, Mertz & Bates Co., L.P.A*., *Rodney M. Arthur*, *Joseph W. O'Neil* and *Daniel R. Michel*, for appellants.

*Eastman & Smith, Ltd*., *Rudolph A. Peckinpaugh, Jr*., and *John D. Wiley, Jr.*, for appellees Robert B. Scheidt, M.D., F.A.C.S., and Robert B. Scheidt, M.D., F.A.C.S., Inc.

*Robison, Curphey & O'Connell*, *E. Thomas Maguire* and *Timothy D. Krugh*, for appellee Paulding County Hospital.

*Leeseberg, Maloon, Schulman & Valentine* and *Geoffrey M. Wardle*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Buckingham, Doolittle & Burroughs, L.L.P*., and *Carol A. Costa*, urging affirmance for *amicus curiae*, Ohio Association of Civil Trial Attorneys.

––––––––––––––––––

**DOUGLAS, J.**

**{¶ 14}** The central issue in this case concerns the extent to which statements from learned treatises and other publications may be used to impeach the testimony

of expert witnesses. Prior to the promulgation of Evid.R. 706,[2] effective July 1, 1998, rules governing the use of learned treatises evolved under the common law. In *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph two of the syllabus, the court held that learned treatises, even though properly identified, authenticated, and recognized as standard authority, are not admissible in evidence to prove the truth of the matter asserted therein. Rather, "learned treatises are considered hearsay, may not be used as substantive evidence, and are specifically limited to impeachment purposes only." *Ramage v. Cent. Ohio Emergency Serv. Inc.* (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828, 838, citing Giannelli, Ohio Evidence Manual (1989), Section 702.06, Author's Comment; *Piotrowski v. Corey Hosp.* (1961), 172 Ohio St. 61, 15 O.O.2d 126, 173 N.E.2d 355; *Lambert v. Dally* (1972), 30 Ohio App.2d 36, 59 O.O.2d 29, 281 N.E.2d 857; and *Hallworth*, *supra*.

{¶ 15} Later, in *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, this court set forth the conditions under which learned treatises can be used to impeach the credibility of expert witnesses. Counsel may use a learned treatise to

---

2. Evid.R. 706, entitled "Learned treatises for impeachment," provides:

"Statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art are admissible for impeachment if the publication is either of the following:

"(A) Relied upon by an expert witness in reaching an opinion;

"(B) Established as reliable authority (1) by the testimony or admission of the witness, (2) by other expert testimony, or (3) by judicial notice.

"If admitted for impeachment, the statements may be read into evidence but shall not be received as exhibits."

As indicated in the Staff Notes to Evid.R. 706, the rule "codifies the common law rule, making it more readily accessible for trial use." The Staff Notes further provide that "[a] possible expansion of the common law rule concerns the use of judicial notice to establish the treatise as a reliable authority. A court taking judicial notice of *Gray's Anatomy* illustrates this aspect of the rule.

"The trial court decides under Evid.R. 104(A) if the treatise is a 'reliable authority' and Evid.R. 105 requires a limiting instruction upon request. If an opposing expert witness refuses to recognize a treatise as reliable, the judge may permit the impeachment subject to counsel's subsequent laying of the foundation through its own expert. There is no need to inform the jury of the trial court's determination."

impeach a testifying expert by establishing that the expert is either unaware of the text or unfamiliar with its contents. *Id.,* paragraph two of the syllabus. Additionally, the substance of a learned treatise can be used to impeach the credibility of an expert witness if the expert has relied upon the treatise in forming his or her opinion or the expert has acknowledged the authoritative nature of the treatise. *Id.*[3]

{¶ 16} In *Stinson*, we determined that the trial court committed reversible error by permitting the cross-examination of an expert with the use of a medical treatise after the expert had stated categorically that he did not consider the text authoritative. Thus, "instead of impeaching the credibility of Dr. Warner [the expert], appellee was permitted to contradict his testimony through the use of the contents of the text despite his earlier testimony that it was not authoritative. This use constituted an impermissible presentation of hearsay evidence to the jury." *Id.*, 69 Ohio St.3d at 458, 633 N.E.2d at 539.

{¶ 17} In the case at bar, both the trial court and court of appeals ruled that *Stinson* prevented appellants' counsel from cross-examining Scheidt and Zucker about the medical literature in question. On cross-examination, both Scheidt and Zucker would not explicitly concede the "authoritative" nature of the literature. Nevertheless, although Scheidt and Zucker refused to explicitly acknowledge the

---

3. In *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph two of the syllabus, we also held that "[t]he learned treatise exception to the hearsay rule set forth in Fed.Evid.R. 803(18) has no counterpart in Ohio Evid.R. 803." In Ohio, the use of learned treatises is limited to impeachment purposes only. *Ramage v. Cent. Ohio Emergency Serv., Inc*. (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828, 838. Conversely, Fed.Evid.R. 803(18) allows treatises to be used as substantive evidence as an exception to the hearsay rule. See Weissenberger's Ohio Evidence Treatise (1999) 343, Section 706.1. Notably, a majority of the states have adopted Fed.Evid.R. 803(18) "in either words or substance." Walsh & Rose, Increasing the Useful Information Provided by Experts in the Courtroom: A Comparison of Federal Rules of Evidence 703 and 803(18) with the Evidence Rules in Illinois, Ohio, and New York (1995), 26 Seton Hall L.Rev. 183, at 229. Moreover, it appears that the federal rule has "enjoyed genuine success in the courtroom." *Id*. at 252. In this regard, we respectfully refer this matter to the Ohio Supreme Court Rules Advisory Committee to fully review Fed.Evid.R. 803(18) and, if appropriate, suggest a counterpart in Ohio Evid.R. 803, allowing treatises and other publications to be used as an exception to the hearsay rule.

authoritative nature of the medical literature, they implicitly conceded as much. See *Jacober v. St. Peter's Med. Ctr.* (1992), 128 N.J. 475, 487, 608 A.2d 304, 311. Scheidt testified that he "hardly [knew] how to define authority," but that his teachers in the area of laparoscopic surgery were "helpful and useful," and that he looked to his teachers for "helpful suggestions." He also stated that the courses pertaining to laparoscopic cholecystectomies "were certainly helpful to me." With respect to Zucker, he testified that Fitzgibbons was a "respected colleague," "I often will quote him," and that he was "a very honorable and honest individual with very good experience." Zucker further stated that he valued Fitzgibbons's "opinions and his expertise," and had "invited him to write a chapter in a textbook that I wrote on laparoscopic surgery." Zucker also testified that he had relied upon materials presented in the chapter in that he "used part of that [chapter] in coming up to my opinions in everyday practice as well as in this testimony."

{¶ 18} In *Stinson*, we determined that it was error to allow the medical treatise to be used for impeachment purposes because a proper foundation had not been laid establishing the text as a reliable authority. However, *Stinson* was not intended to allow testifying experts to adroitly evade cross-examination simply by avoiding such words as "rely" or "authority" or any forms of those words. Indeed, if an expert witness relies upon published medical literature in forming his or her opinion, or the expert provides testimony sufficient to establish that the literature is reliable authority, or the literature is part of the expert's own publication, statements contained in the literature can be used for purposes of impeachment. The requisite reliance upon published medical literature or its authoritative nature can be established without an express acknowledgement by the testifying expert that he or she had relied upon the literature or that it is authoritative.

{¶ 19} The testimony of Scheidt and Zucker established that the medical literature at issue was reliable authority. Moreover, testimony and other evidence in the record indicate that Scheidt and Zucker also relied upon the literature in

forming their opinions. The literature was not offered by appellants' counsel as substantive evidence. Instead, the literature was intended to call into question the weight to be attached by the fact finder to the testimony of Scheidt and Zucker. In this regard, the restricted cross-examination of Scheidt and Zucker by the trial court harmed the fact-finding process and prevented the jury from adequately assessing the credibility of the witnesses.

{¶ 20} Accordingly, we believe that, in this case, the trial court's decision to prohibit cross-examination with respect to the medical literature in question constituted prejudicial error. See Civ.R. 61 and R.C. 2309.59. Therefore, the judgment of the court of appeals is reversed, and the cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., dissents.

———————————

**COOK, J., dissenting.**

{¶ 21} While I agree with the rule announced by the majority, I do not agree that the record in this case supports the application of the rule and therefore would affirm the judgment of the court of appeals that the exclusion of the evidence was not an abuse of discretion.

———————————