OPINION
{¶ 1} Plaintiff, Beatrice Bedard, appeals from a judgment for Defendants, Charles C. Gardner, Jr., M.D. and Charles C. Gardner, Jr., M.D., Inc., on Plaintiff's claim for relief alleging medical malpractice. Defendants filed a cross-appeal.
 {¶ 2} In September of 1999, Beatrice Bedard was referred by her general physician to Charles C. Gardner, M.D., a colorectal surgeon who practices in Dayton, on complaints of abdominal pain indicating the possibility of diverticulitis, an inflammation of the small pockets in the wall of the colon. In more serious cases such inflammation may cause obstruction, perforation, and/or bleeding of the bowel.
 {¶ 3} Upon examination, Dr. Gardner diagnosed that Ms. Bedard suffered from diverticulitis of the sigmoid colon sufficiently serious to justify surgery. He recommended performing a sigmoidectomy with colorectal anastomosis. The procedure involves surgical removal of the diseased section of the colon and rejoining the healthy portion of the colon and the rectum using a stapling procedure. An anastomosis is a joinder thus created.
 {¶ 4} Ms. Bedard declined to undergo the surgery when it was recommended by Dr. Gardner. At age sixty-six, she suffered from a number of other adverse health conditions. The most serious of those were heart problems, for which blood thinners had been prescribed, and diabetes. Those conditions and their treatments made a successful recovery from surgery more problematic.
 {¶ 5} In July of 2000, Ms. Bedard was admitted to Miami Valley Hospital in Dayton for treatment of her diabetes condition. While there, she consulted again with Dr. Gardner and decided to submit to the surgery he had recommended. The procedure was performed at Miami Valley Hospital on July 11, 2000. Dr. Gardner was assisted in the surgery by two resident physicians, Dr. Hooker and Dr. Piovesan.
 {¶ 6} Dr. Gardner performed a sigmoidectomy, excising a portion of the lower or sigmoid colon where it joined the rectum. The opening in the remaining rectal stump was secured with linear staples. Following that, a circular stapler device was inserted through the anus into and through the rectum. Tissue from the remaining healthy colon was secured to the stapler, which when operated drew the healthy colon section downward toward the rectum. When the colon and the opening in the rectum were joined, forming a connection or anastomosis, the stapler excised a "donut" of tissue from the circumference of each section while it inserted open "C"-shaped titanium staples through both to secure their connection. The stapler then crimped the staples closed. Liquid was injected into the rejoined colon and no leaks were found.
 {¶ 7} Ms. Bedard weathered the surgery reasonably well. Her post-operative care was as expected. That included voiding stool which was infused with blood through the rectum, which indicated that the surgical site remained secure. She was released from Miami Valley Hospital on July 17, 2000.
 {¶ 8} The following day, July 18, 2000, Ms. Bedard telephoned Dr. Gardner complaining of severe abdominal pain and rectal bleeding. He advised her to go to the emergency room at Miami Valley Hospital. She did, and was admitted to the hospital for observation of those conditions.
 {¶ 9} A significant but medically acceptable consequence of a sigmoidectomy with colorectal anastomosis is that the anastomosis, the end-to-end union of the colon and the rectum, may undergo a dehiscence, a disruptive opening along the lines of the sutures. Then, fecal material passes out of the opening in the colon into the abdominal cavity. As it does, the tissue at the site of the separation typically becomes infected and inflamed. The infection results in an abnormal elevation of white blood cells.
 {¶ 10} Ms. Bedard did not exhibit an elevation of her white cell blood count. A CT scan was performed, but it showed no such irregularities. However, on July 20, 2000, at 12:40 a.m., a nurse observed fecal material passing out of Ms. Bedard's vagina. She telephoned Dr. Gardner, who indicated that he would see Ms. Bedard the following day.
 {¶ 11} Dr. Gardner examined Ms. Bedard later in the day on July 20, 2000. A digital examination of the surgical site indicated to him that it was secure. In view of her problems, he scheduled an exam under anesthesia, which he performed on July 22, 2000.
 {¶ 12} The exam under anesthesia that Dr. Gardner performed on July 22, 2000, revealed that a dehiscence of the anastomosis had occurred. It also revealed that a fistula, or hole, had developed from the rectum and into the adjoining vagina, allowing fecal material to pass into the vagina and out through the vaginal cavity. It was necessary that the condition be stopped, and to accomplish that Dr. Gardner performed a colostomy, which involved diverting the flow of fecal material from the colon above the site through a tube to be collected in a bag carried outside the body.
 {¶ 13} Dr. Gardner explained to Ms. Bedard that the dehiscence and the fistula would, in his view, require several surgical procedures to correct, following which the colostomy would be reversed and removed. She remained at Miami Valley Hospital to recuperate until August 4, 2000, when she was discharged.
 {¶ 14} Ms. Bedard subsequently sought a second opinion from Dr. Deepak Kumar, a colorectal surgeon who also practices in Dayton. Dr. Kumar examined Ms. Bedard on August 23 and September 6, 2000. He performed simultaneous digital examinations of the rectum and the vagina.
 {¶ 15} Dr. Kumar discovered the fistula between the rectum and the vagina. He also found a line of staples joining the rectum to the vagina at about the same point. From that fact, as well as the unusually large size of the fistula, he concluded that Ms. Bedard's vagina and rectum had been stapled together, and further concluded that the fistula was produced in the process when the circular stapler had also cut an open hole in the vaginal wall. Like Dr. Gardner, Dr. Kumar recommended a series of surgeries to correct these problems.
 {¶ 16} Concerned about her condition and the prospect of more surgery, Ms. Bedard decided to have the surgery she needed performed in Phoenix, Arizona, where her adult daughter resides. Ms. Bedard was referred to Dr. Robert V. Stephens, a general surgeon who performs colon resections and who is experienced in repairing rectovaginal fistulas. Dr. Stephens first examined Ms. Bedard using a sigmoidoscope and was able to see the fistula. He recommended a single surgery to close the fistula, repair the anastomosis, and "take down" the colostomy. Ms. Bedard agreed. She was taken off the blood thinners prescribed for her heart condition to allow her to undergo surgery.
 {¶ 17} Dr. Stephens performed the proposed surgery on November 8, 2000. However, after opening the abdomen he discovered a mass of adhesions connecting the colon and the other organs around it. It took considerable time to cut through the adhesions to reach the fistula. When Dr. Stephens observed that condition, he saw a line of staples connecting the rectum to the vagina. After separating the two, he closed the fistula. However, because many hours had by then passed, he concluded that it would be better to conclude the surgery at that point. Therefore, he was unable to take down the colostomy.
 {¶ 18} Ms. Bedard suffered several serious reactions after Dr. Stephens'surgery that required her hospitalization in Phoenix for several months. She was eventually discharged and returned to Ohio.
 {¶ 19} Ms. Bedard commenced her action for medical malpractice against Dr. Gardner and his professional corporation on December 20, 2001. After responsive pleadings were filed, extensive discovery was conducted. Among the pretrial motions that were filed, Plaintiff moved for summary judgment on any allegation of negligence Defendant might make against Dr. Stephens in connection with the surgery he performed. The court denied that motion, as well as liminal motions to limit evidence demonstrating negligence on the part of Dr. Stephens.
 {¶ 20} The case proceeded to trial on January 12, 2004. Numerous witnesses testified over several days, including for the Plaintiff, Ms. Bedard, Dr. Kumar, Dr. Stephens, a nurse from Miami Valley Hospital, and Dr. Bruce A. Kerner, an expert witness who opined that Dr. Gardner was negligent. Defendant Dr. Gardner testified on his own behalf, supported by two other physicians' deposition testimony and the testimony of an expert, Dr. Mark Arnold, who opined that Dr. Gardner was not negligent.
 {¶ 21} On January 21, 2004, the jury returned a verdict against Plaintiff Bedard and for Defendant Stephens. The jury also found in its response to an interrogatory that Dr. Gardner was not negligent. A judgment on the verdict was journalized on February 26, 2004. On March 10, 2004, Plaintiff filed a motion for new trial. The trial court overruled the motion on September 20, 2004. Prior to that, on March 24, 2004, Plaintiff had filed her notice of appeal. We previously construed the notice to be premature to the trial court's September 20, 2004 order denying the motion for new trial and, per App.R. 4(C), as a notice encompassing any error that order involves. Defendant filed a timely notice of cross-appeal.
 I. Ms. Bedard's Appeal FIRST ASSIGNMENT OF ERROR
 {¶ 22} "THE TRIAL COURT ERRED IN DENYING PLAINTIFFA-PPELLANT'S REQUEST FOR A NEW TRIAL SINCE THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 23} Civ.R. 59(A)(6) authorizes the trial court to vacate a judgment and order a new trial on a finding that the verdict on which the judgment was entered "is not sustained by the weight of the evidence." When that claim is made, the court must review the evidence and pass in a limited way on the credibility of the witnesses. Atkinson v. Internatl. Technegroup, Inc. (1995),106 Ohio App.3d 349. It must appear to the court that a manifest injustice has been done and that the verdict is against the manifest weight of the evidence. Rohde v. Farmer (1970),23 Ohio St.3d 82. For example, where it appears probable that a verdict is based on false testimony, a motion for a new trial should be granted. Markan v. Sawchyn (1987),36 Ohio App.3d 136.
 {¶ 24} A verdict is not against the weight of the evidence merely because the judge would have decided the case differently.Parm v. Patton (1969), 20 Ohio App. 2d 83. If the jury's verdict is supported as to each element of the plaintiff's case by some competent and apparently credible evidence, a defendant's motion for new trial should not be granted. Dyer v. Hastings
(1950), 87 Ohio App. 147. Conversely, if evidence the defendant offered to rebut one or more of those elements of the plaintiff's case is competent and apparently credible, a plaintiff's motion should not be granted.
 {¶ 25} Whether to grant or deny a Civ.R. 59(A)(6) motion rests with the trial court's sound discretion, and the decision cannot be reversed by a reviewing court without finding an abuse of discretion by the trial court. Tobler v. Hannon (1995),105 Ohio App.3d 128. "`Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable."Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87. "A decision is unreasonable if there is no sound reasoning process that would support that decision." AAA Enterprises v. RiverplaceCommunity (1990), 50 Ohio St.3d 157, 161.
 {¶ 26} Ms. Bedard's claim for relief alleging medical malpractice required her to prove by a preponderance of the evidence that her colorectal fistula and the injuries associated with it, including any need for further surgery, was proximately caused by Dr. Gardner's doing of some thing or failure to do some particular thing or things that such a physician would not have done under like or similar conditions or circumstances, breaching the duty of care the law imposes on physicians. Bruni v.Tatsumi (1976), 46 Ohio St.2d 127. The standard of conduct applicable to the breach of the duty of care alleged in a claim for medical malpractice is "good practice." Berdyck v. Shinde
(1993), 66 Ohio St.3d 573.
 {¶ 27} Stapling the rectum to the vagina in the course of a sigmoidectomy with a colorectal anastomosis is clearly not good practice. Plaintiff Bedard's theory was that such a failure occurred in the course of the surgery that Dr. Gardner performed on July 11, 2000. As a result, according to Ms. Bedard's theory, an opening or fistula between the vagina and rectum was created, which most likely occurred because the circular stapler had excised tissue from both structures when it joined them together. The fistula then allowed fecal matter to pass from the rectum into the vagina and out the vaginal canal.
 {¶ 28} Plaintiff Bedard's evidence to prove her theory was both direct and circumstantial. Her direct and strongest evidence was the testimony of Dr. Stephens and Dr. Kumar, who both stated that the rectum and vagina were connected by a common line of staples. Dr. Kumar's conclusion was based on his digital examination from within the two structures simultaneously. Dr. Stephens' was based on his visual examination of the rectum and vagina during the surgery he performed. Both concluded that the fistula resulted from stapling the two structures together. That the fistula was not caused by an inflammatory process resulting from the failed anastomosis is confirmed, according to Plaintiff, by the lack of any abscess or infection at the site when Dr. Gardner performed his second surgery on July 22, 2000, which is consistent with Ms. Bedard's lack of an elevated white blood cell count.
 {¶ 29} Defendant Gardner's theory was that the dehisencence or separation of the anastomosis connecting the colon and rectum likely resulted from poor blood supply and created an inflammatory process that opened a fistula from the rectum and into the vagina, which lies next to it. He opined that the inflammatory process had carried some of the staples into the vaginal wall, and that the scar tissue that resulted held the staples and made it appear to Dr. Stephens and Dr. Kumar that the vagina and rectum had been stapled together.
 {¶ 30} Dr. Gardner relied primarily on his own first-hand knowledge concerning the events of the surgery. He explained the precautions he took to avoid a stapling error. Those included pulling the vagina away from the surgical site with a retractor and feeling about the completed anastomosis with his hand to determine that it was secure and free, which was confirmed when liquid was injected into the colon. He also explained that the surgical stapler could not, in his experience, have accepted the additional vaginal tissue as it necessarily would have if the vagina had been stapled to the rectum. He further pointed out that, had a fistula been created during the July 11, 2000 surgery, as Plaintiff claimed, Ms. Bedard would likely have expelled feces through the vaginal cavity long before she was discharged on July 17, 2000, and she did not. It was first reported only on July 20, 2000, after her readmission. He also pointed out that the pathologist's report on tissue submitted after the July 11, 2000, surgery failed to report the presence of vaginal tissue, which it likely would have had an incision of the vaginal wall also occurred.
 {¶ 31} These competing theories and the evidence offered to prove them were further supplemented as well as refuted or challenged by the extensive evidence the parties offered, much of it in the form of medical records and expert opinion testimony. However, the foregoing explanation outlines the differences in the evidence that was offered in detail sufficient to now address the merits of the error Plaintiff Bedard assigns, which is that the trial court erred when it denied her motion for a new trial.
 {¶ 32} Plaintiff Bedard argues that the trial court abused its discretion when it rejected her contention that the verdict and judgment for Defendant Gardner "is not sustained by the weight of the evidence," per Civ.R 59(A)(6), and overruled Plaintiff's motion for new trial founded on that contention. Plaintiff relies on the "physical facts rule" in support of her contentions.
 {¶ 33} The physical facts rule holds that "[t]he testimony of a witness which is positively contradicted by the established physical facts is of no probative value and a jury will not be permitted to rest a verdict thereon." McDonald v. Ford MotorCo. (1975), 42 Ohio St.2d 8, Syllabus by the Court. Neither may "[t]he testimony of a witness which is positively contradicted by the physical facts be given probative value by the court." Id., at p. 12.
 {¶ 34} The established physical facts sufficient to reject contradictory testimony were described in McDonald to include those established by the laws of nature or the laws of science. In contrast to them, "`[t]he palpable untruthfulness' of plaintiff's testimony requiring a trial court to take a case from the jury under the physical facts rule' must be (1) inherent in the rejected testimony, so that it contradicts itself or (2) irreconcilable with facts of which, under recognized rules, the court takes judicial knowledge or (3) is obviously inconsistent with, contradicted by, undisputed physical facts.' Duling v.Burnett (1938), 22 Tenn.App. 522, 124 S.W.2d 294. Each of these formulations strikes a balance between, on the one hand, the common sense notion that physical facts and evidence can be so conclusive and demonstrative that no reasonable person could accept the truth of contrary testimony, and, on the other hand, the need for courts to be wary of treating a party's theory of a case as `fact,' when a different theory is also possible in the case." Id., at pp. 12-13.
 {¶ 35} In McDonald, the court applied the physical facts rule in an automobile products liability case. The plaintiff testified that the steering column of their new car fell away from the dashboard, causing them to lose control and collide with a tree. The defendant manufacturer contended that the steering column was designed to collapse on impact, and likely broke away when and because the car struck the tree. Referring to the condition of the mounting blocks for the steering column, which were damaged, the court concluded that the only possible explanation for the damage was that the steering column broke away, as it was designed to do, after and because of the collision. The court stated that any other explanation would be speculative.
 {¶ 36} In overruling Plaintiff's motion for new trial on this point, the trial court found that the testimony of Dr. Gardner and other witnesses he presented was competent, credible evidence sufficient to support his theory that Ms. Bedard's rectovaginal fistula resulted from the failed anastomosis, which is a result within the acceptable range of risks for surgery of this kind, and that whether to reject that evidence in favor of the evidence and theory the Plaintiff presented was a matter which the jury, properly charged, could decide.
 {¶ 37} Plaintiff Bedard argues that the trial court's rationale was improper under the physical facts rule. She points out that Dr. Stephens, upon direct visual examination, and Dr. Kumar, by his sense of touch, clearly established in their testimonies that her rectum and vagina had been stapled together, which necessarily occurred in the course of Dr. Gardner's surgery. Plaintiff points out that Dr. Stephens and Dr. Kumar were disinterested witnesses, as opposed to Defendant Gardner, and that Dr. Gardner had not examined the surgical site in the ways Dr. Stephens and Dr. Kumar had. She also points out that the circumstantial evidence of a lack of infection demonstrates that the colorectal fistula was not the product of an inflammatory process resulting from the failed anastomosis, as Dr. Gardner claimed.
 {¶ 38} The physical facts in McDonald were undisputed, and the claim in opposition to them was so otherwise unsupportable as to be speculative. Here, the alleged physical facts are those observed by Drs. Stephens and Kumar. Plaintiff's contentions, while persuasive, do not necessarily foreclose the theory that Dr. Gardner offered. He suggested that both Dr. Stephens and Dr. Kumar had observed or felt a line of staples secured into the smooth scar tissue an inflammation had created between the rectum and vagina, making it appear that they had been stapled together. He explained that the infection producing the inflammation may not have been detected by tests that were conducted. His explanation of the precautions he took to avoid an accident of this kind and to confirm that it had not occurred were persuasive. Most persuasive of all the circumstantial evidence, perhaps, is Dr. Gardner's contention that had the fistula been caused during his July 11, 2000 surgery, Ms. Bedard would have expelled feces from her vagina before she was discharged from the hospital on July 17, 2000, because she voided through the rectum prior to that time.
 {¶ 39} We cannot find that the evidence Plaintiff offered is so conclusive or demonstrative that no reasonable person could accept the truth of Dr. Gardner's contrary testimony. McDonald.
Plaintiff's theory contended facts, but the facts contended were subject to dispute, and not so conclusive as to make the trial court's finding that the verdict was not against the weight of the evidence one which is an abuse of the discretion conferred on the court by Civ.R. 59(A)(6).
 {¶ 40} Plaintiff Bedard's first assignment of error is overruled.
SECOND ASSIGNMENT OF ERROR
 {¶ 41} "THE TRIAL COURT ERRED IN ALLOWING EVIDENCE THAT PLAINTIFF-APPELLANT'S SUBSEQUENT TREATING PHYSICIAN, DR. STEPHENS, WAS NEGLIGENT."
 {¶ 42} Having been advised by Defendant that one of his expert witnesses would offer evidence tending to show that her principal expert witness, Dr. Stephens, was negligent in the surgery he performed to repair Plaintiff Bedard's rectovaginal fistula and take down her colostomy, Plaintiff moved for summary judgment on November 6, 2003, asking the court to bar any defense of intervening/superceding cause that might permit evidence of Dr. Stephens' alleged negligence to be offered. After extensive briefing, the court denied the motion, holding that the question whether any alleged negligence on the part of Dr. Stephens was in fact independent of the prior alleged negligence of Dr. Gardner was a genuine issue of material fact for the jury to determine.
 {¶ 43} On the first day of trial, Plaintiff renewed her argument in the form of a motion in limine, asking the court to "bar in substance any evidence that Dr. Stephens violated the standard of care." (T. 4). The court denied the liminal motion on the same grounds on which summary judgment had been denied.
 {¶ 44} At trial, Defendant was permitted to cross-examine Plaintiff's witnesses and elicit testimony from his own witnesses, over Plaintiff's objections, concerning the surgery Dr. Stephens performed. Defendant's stated purpose was to prove an intervening/superceding cause defense. The questions and some of the responses the witnesses made set up two propositions relevant to Dr. Stephens' conduct. First, that his surgical plan to repair Ms. Bedard's recto-vaginal fistula and take down her colostomy in one surgical procedure, as opposed to the multiple surgeries Dr. Gardner and Dr. Kumar had recommended, was inappropriate. Second, that the surgery Dr. Stephens performed after he necessarily abandoned his surgical plan was harmful to Ms. Bedard, requiring several months hospitalization in order for her to recover from its effects.
 {¶ 45} After evidence relevant to those propositions had been offered through a number of witnesses, Plaintiff once more moved to exclude such evidence, citing to the trial court our holding in Bender v. Carr (1987), 40 Ohio App.3d 149, that subsequent medical malpractice is not a superceding cause that cuts off the liability of a prior tortfeasor, because the prior injury the tortfeasor caused is a proximate cause of any subsequent injury. The court then agreed to allow no further evidence relevant to Dr. Stephens' alleged negligence and said that it would not instruct the jury on an intervening/superceding cause defense. Plaintiff indicated that she would ask the court for a curative instruction on the evidence that had been offered. (T. 621).
 {¶ 46} Plaintiff argues on appeal that the trial court erred when it permitted Defendant to offer evidence probative of Dr. Stephens' alleged negligence. Defendant argues that any such error was harmless.
 {¶ 47} The rule of law applicable to the intervening/superseding cause defense was explained in Beredyckv. Shinde (1993), 66 Ohio St.3d 573, which involved alleged medical malpractice subsequent to prior malpractice on the part of a hospital:
 {¶ 48} "The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. `Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.'Garbe v. Halloran (1948), 150 Ohio St. 476, 38 O.O. 325, 83 N.E.2d 217, paragraph one of the syllabus.
 {¶ 49} "In order to relieve a party of liability, a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. Hurt v.Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 323, 58 O.O. 119, 130 N.E.2d 824, paragraph one of the syllabus; Thrash v.U-Drive-It Co. (1953), 158 Ohio St. 465, 49 O.O. 402,110 N.E.2d 419, paragraph two of the syllabus. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury.
 {¶ 50} "Thus, we hold that the intervening negligence of an attending physician does not absolve a hospital of its prior negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury. In order to break the chain, the intervening negligence of the physician must be disconnected from the negligence of the hospital and must be of itself an efficient, independent, and self-producing cause of the patient's injury." Id., at pp. 584-585.
 {¶ 51} Plaintiff argues, and we agree, that the surgery Dr. Stephens performed could not absolve Defendant Gardner of liability for any malpractice his prior surgery involved because Dr. Stephens' surgery was not disconnected from the surgery Dr. Gardner performed, and was not of itself an efficient, independent, and self-producing cause of any further injury she suffered. Id. Having said that, however, the error assigned is subject to two further qualifications.
 {¶ 52} First, the motion for summary judgment Plaintiff filed is governed by Civ.R. 56(A), which permits "[a] party seeking to recover on a claim, counterclaim, or cross-claim or to obtain a declaratory judgment (to) move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part of the claim, counterclaim, cross-claim, or declaratory judgment action." (Emphasis supplied). Therefore, under the terms of the rule, "[i]f a party may move for summary judgment as to `any part' of a claim, that party can presumably move for partial summary judgment with respect to some of the issues involved in the claim." Baldwin's Ohio Civil Practice, Vol. 2, Section 56:42.
 {¶ 53} The defense of intervening/superceding cause may be the basis of a summary judgment granted on a defendant's Civ.R. 56(B) motion when it forecloses a plaintiff's claim for relief.Miller v. The Dayton Power and Light Company (June 9, 2000), Montgomery App. No. 18096. When the defense is affirmatively pleaded, as it was in Miller, it becomes an issue involved in the plaintiff's claim for relief, and the plaintiff is put on notice that the defendant may move for partial summary judgment on the defense.
 {¶ 54} Defendant Gardner did not plead intervening/superceding cause as a defense. Civ.R. 8(C) provides that affirmative defenses must be pleaded, and if not pleaded are waived. The complimentary Federal Rule has been held to apply to the intervening/superceding cause defense. Ritch v. A M GeneralCorp. 1997 WL 834214 (D.N.H.). However, the issue of intervening/superceding cause has also been held to not be an affirmative defense, but only an element to be considered by the jury in determining the existence or non-existence of proximate cause. Dallas Railway and Terminal Co. V. Bailey (1952),151 Tex. 359, 250 SW 2d 379.
 {¶ 55} Ohio has not taken a position with respect to whether intervening/superceding cause is an affirmative defense subject to the requirements of Civ.R. 8(C). On the one hand, the examples of such defenses the Rule sets out is non-exclusive, and intervening/superceding cause comfortably fits the description of an affirmative defense as any defensive matter in the nature of a confession and avoidance. On the other, intervening/superceding cause has also been characterized as a new matter which, assuming the complaint to be true, constitutes a defense to that complaint. Davis v. Cincinnati, Inc. (1991),81 Ohio App.3d 115. In view of our holding in Bender v. Carr, that would not seem to apply to alleged subsequent medical malpractice.
 {¶ 56} In any event, Plaintiff did not argue Civ.R. 8(C) or waiver when she moved to bar Defendant's proposed intervening/superceding cause defense. And, though Defendant failed to plead it, Defendant asserted his right to rely on the defense and present evidence in support of it when he opposed Plaintiff's motion for summary judgment. The issue the motion for summary judgment presented, therefore, was whether the defense could apply to bar or affect Plaintiff's medical malpractice claim.
 {¶ 57} We find that the trial court erred when it denied Plaintiff's motion for summary judgment, because our prior holding in Bender v. Carr made the defense of intervening/superceding cause unavailable on this record. We also find that the error was nevertheless harmless. In the end, the court gave no instruction to the jury on the defense of intervening/superceding cause. And, for the reasons explained below, the evidence Defendant was allowed to present in support of the defense, before the court eventually sustained Plaintiff's objection to it, was otherwise admissible, which is the second qualification to which our prior conclusion is subject.
 {¶ 58} Dr. Stephens testified as an expert witness per Evid.R. 702(B). Whether a witness is qualified to testify as an expert is a matter for the court to determine pursuant to Evid.R. 104(A). Even so, the weight to be given the expert's testimony is a matter for the jury. Relative weaknesses in the expert's body of expertise may be brought out to determine the weight the trier of fact should accord to the expert's testimony.
 {¶ 59} Dr. Stephens testified that when he opened Ms. Bedard's abdomen and reached the site of the failed anastomosis he "saw staples between the vagina and the rectum" (T. 354), that the stapling formed "a connection . . . between the rectum and the vagina" (T. 361) which had been created in the course of the surgery Dr. Gardner performed on July 11, 2000 (T. 362), that all the problems Ms. Bedard experienced, including her rectovaginal fistula, were a "direct result" of the stapling error (T. 370), and that Dr. Gardner's failure to recognize and repair the error breached the duty of care he owed Ms. Bedard. (T. 371).
 {¶ 60} Dr. Gardner's theory and his own testimony concerning the cause of the fistula flatly contradicted Dr. Stephens' observations and conclusions. In order to persuade the jury to give less weight to them, Dr. Gardner was entitled to offer evidence tending to expose relative weaknesses in the body of Dr. Stephens' expertise, impeaching his credibility. Such evidence might, as it did, question the appropriateness of Dr. Stephens' surgical plan, as well as the effects Ms. Bedard suffered after the surgery he performed. The further issue, and the one which is central to this assignment of error, is whether the way in which the court allowed Defendant to introduce such impeachment evidence was improper.
 {¶ 61} Defendant brought these matters out in his cross-examination of Dr. Stephens. Evid.R. 611(B) provides: "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." The rule applies to all witnesses, lay or expert. Cross-examination of Dr. Stephens on those matters was therefore proper.
 {¶ 62} Plaintiff's real complaint, however, is that Defendant was also permitted to pose like questions concerning Dr. Stephens' conduct to her as well as to the other physicians who testified as experts in the case in order to impeach Dr. Stephens' credibility. "In the impeachment context, extrinsic evidence means evidence introduced through the testimony of other witnesses." 1 McCormick, Evidence, Section 36, at 131 (5th Ed.). Evid.R. 616(C) states: "Specific contradiction. Facts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony. If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible unless the evidence is one of the following: "(1) Permitted by Evid. R. 608(A), 609, 613, 616(A), 616(B), or 706;
 {¶ 63} "(2) Permitted by the common law of impeachment and not in conflict with the Rules of Evidence." (Emphasis supplied).
 {¶ 64} None of the specific exceptions in Evid.R. 616(C)(1) apply to the testimony Defendant elicited from other witnesses concerning Dr. Stephens. The evidence offered was extrinsic to Dr. Stephens' own testimony, and concerned facts offered for purposes of impeachment. However to fall within the prohibition of Evid. R. 616(C), the evidence must also be offered "for the sole purpose of impeaching a witness's testimony."
 {¶ 65} According to Wigmore, extrinsic evidence of contradiction should be admitted if the evidence would be admissible "for any purpose independent of the contradiction." 3A Wigmore, Evidence, Section 1003, at 961 (1970 Ed.) Contradiction on collateral matters was prohibited at common law. E.g., Byominv. Alvis (1959), 169 Ohio St. 395. However, McCormick writes that a "matter is non-collateral and extrinsic evidence consequently (is) admissible if the matter itself is relevant to a fact of consequence on the historical merits of the case." 1 McCormick, supra, Section 49, at 203. These considerations address the further "common law" exception in Evid.R. 616(C)(2).
 {¶ 66} Plaintiff Bedard's claim for relief did not require the jury to pass on the fact of Dr. Gardner's alleged stapling error alone. She also asked the jury to consider the consequences of the alleged error, including the need for the further surgery that Dr. Stephens performed four months later. Ms. Bedard testified that her medical bills totaled $512,000, which included the costs associated with the surgery Dr. Stephens performed. (T. 127). She made no claim for special damages, but did "suggest to (the jury) that that figure gives you a fair and reasonable context with which to evaluate the sum, the total of damages you will award. It's a linchpin, a benchmark, if you will. It says something about the severity of everything else that happened to her." (T. 954). The appropriateness of the surgery that Dr. Stephens performed and its aftermath were therefore facts of consequence on the historical merits of the case, McCormick,
and extrinsic evidence concerning those matters was admissible for purposes other than contradiction, Wigmore, and thus not barred by Evid.R. 616(C), notwithstanding the fact that it also tended to contradict Dr. Stephens' testimony and undermine his expertise in the jury's eyes.
 {¶ 67} When the court made its ruling based on Bender v.Carr, reversing its prior holdings, the court stated that Plaintiff might request a curative instruction concerning the evidence critical of Dr. Stephens that had been offered and Plaintiff indicated that such an instruction would be presented. None was. That, perhaps, is reflective of Plaintiff's dilemma. Her strategy was to ask the jury to rely on Dr. Stephens' testimony, but any instruction suggesting he might have been negligent was a tactic that could undermine the value of her strategy. So, Plaintiff apparently elected to offer no curative instruction, and the court instructed the jury merely that "[w]here an original act is negligent, the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." (T. 919). On this record, that instruction was proper.
 {¶ 68} The second assignment of error is overruled.
THIRD ASSIGNMENT OF ERROR
 {¶ 69} "THE TRIAL COURT ERRED IN BARRING PLAINTIFF FROM EXPOSING AN INCONSISTENCY BETWEEN THE TRIAL TESTIMONY OF DR. GARDNER AND THE DEPOSITION TESTIMONY OF THE RESIDENT PHYSICIANS PRESENT DURING THE JULY 11, 2000 SURGERY."
 {¶ 70} During his cross-examination by Plaintiff's counsel, Dr. Gardner acknowledged that he had been assisted in the surgery he performed on Ms. Bedard by Dr. Hooker, a senior surgical resident physician at Miami Valley Hospital. (T. 837). Dr. Gardner further testified that Dr. Hooker participated with him in operating the circular stapler used to create the anastomosis. (T. 839-840).
 {¶ 71} Plaintiff's counsel next referred to Dr. Gardner's discovery deposition, in which he stated that he couldn't recall which of them, he or Dr. Hooker, had actually "fired" the circular stapler, acknowledging that one did while the other held the instrument in place. (T. 840). In his deposition, Dr. Gardner further stated that he couldn't recall which of them had inserted the stapler through the anus to reach the location at which it was "fired." (T. 841).
 {¶ 72} It appears from the record that Dr. Hooker, a physician in the United States Air Force, was out of the country and therefore unavailable to testify at trial. However, she had been deposed by Plaintiff in discovery. Plaintiff's counsel then next attempted to use Dr. Hooker's deposition to cross-examine Dr. Gardner concerning his testimony about their respective roles in operating the circular stapler. Defendant objected, and the court sustained the objection. (T. 851).
 {¶ 73} Plaintiff argues, as she did in the trial court, that Civ.R. 32(A) as well as Evid.R. 703 and Evid.R. 705 authorized her use of Dr. Hooker's deposition to cross-examine Dr. Gardner, and that the trial court erred when it rejected her arguments.
 {¶ 74} As a preliminary matter, Defendant has moved to strike this assignment of error because Plaintiff failed to include a copy of Dr. Hooker's deposition in the trial record. A copy was attached as an exhibit to Plaintiff's appellate brief. Defendant also moved to strike the attachment.
 {¶ 75} A record can be supplemented only to add matters that were actually before the trial court and therefore constitute a part of the proceedings. State v. Ishmail (1978),54 Ohio St. 2d 402. An appellate court cannot permit matters not before the trial court to be added to the record on appeal and then determine the appeal based upon such newly added evidence.Papadelis v. First American Sav. Bank (1996),112 Ohio App.3d 576.
 {¶ 76} Because it was not a part of the record prepared by the clerk of the trial court pursuant to App.R. 9(A) and filed in this proceeding by the clerk of the court of appeals pursuant to App.R. 11(B), we may not consider the copy of the deposition attached to Plaintiff's brief on appeal. However, we are not required to strike the assignment of error for that reason, because evidence of the deposition and its contents was excluded during cross-examination. Evid.R. 103(A)(2).
 {¶ 77} This assignment of error presents two issues. First, was Dr. Hooker's deposition available for use in cross-examining Dr. Gardner? Second, if it was available for use, was the purpose for which the evidence was offered a proper purpose?
 {¶ 78} Civ.R. 32(A) provides, in pertinent part:
 {¶ 79} "Every deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing.
 {¶ 80} "At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions:
 {¶ 81} "(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.
* * *
 {¶ 82} "(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (a) that the witness is dead; or (b) that the witness is beyond the subpoena power of the court in which the action is pending or resides outside of the county in which the action is pending unless it appears that the absence of the witness was procured by the party offering the deposition; or (c) that the witness is unable to attend or testify because of age, sickness, infirmity, or imprisonment; or (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or (e) that the witness is an attending physician or medical expert, although residing within the county in which the action is heard; or (f) that the oral examination of a witness is not required; or (g) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."
 {¶ 83} Dr. Hooker, the deponent, was not testifying as a witness. Dr. Gardner was. Therefore, Dr. Hooker's deposition was not available for use pursuant to Civ.R. 32(A)(1) to cross-examine Dr. Gardner. However, Dr. Hooker's deposition might have been available for use under several of the provisions in Civ.R. 32(A)(2). Being out of the county, she was "(a) . . . beyond the subpoena power of the court." For that same reason, Plaintiff "(d) (was) unable to procure the attendance of the witness by subpoena." And, Dr. Hooker fits the classification of an "(e) . . . attending physician" with respect to Ms. Bedard's surgery. Under any of those provisions, the deposition was available for use by the Plaintiff in cross-examining Dr. Gardner.
 {¶ 84} "While discovery in general is governed by discovery rules, the admission of depositions at trial is governed by the trial evidence rules. Thus, only those parts of a deposition which would be admissible into evidence under the Ohio Rules of Evidence may be used in a court proceeding. Klein/Darling, Baldwin's Ohio Civil Practice, Vo. 2, Section 32:4, at 60.
 {¶ 85} The trial court sustained Defendant's objection to Plaintiff's use of Dr. Hooker's deposition on a finding that the statements Dr. Hooker made in her deposition are inadmissible hearsay. Evid.R. 802. We agree that the evidence satisfies the definition of hearsay in Evid.R. 801(C) because, as Plaintiff intended to use Dr. Hooker's deposition testimony, it is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Civ.R. 32(A) creates an exception to the rule against hearsay, however, by permitting a deposition to be used "as though the witness were then present and testifying . . ." Nevertheless, exception applies only when the mandatory prior filing requirement of Civ.R. 32(A) is satisfied. Because Plaintiff failed to either file Dr. Hooker's deposition prior to trial or obtain an exception to that requirement from the court on a finding of good cause, Plaintiff is not entitled to the exception to the rule against hearsay that Civ.R. 32(A) creates. Because hearsay evidence is not "admissible under the rules of evidence," Civ.R. 32(A), the trial court correctly excluded evidence of statements Dr. Hooker made in her deposition.
 {¶ 86} Plaintiff's alternative theory was that the statements Dr. Hooker made in her deposition, though hearsay, were admissible in Dr. Gardner's cross-examination per Evid.R. 703 and Evid.R. 705.
 {¶ 87} Evid.R. 703 states:
 {¶ 88} "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."
 {¶ 89} Evid.R. 705 states:
 {¶ 90} "The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."
 {¶ 91} Plaintiff argues, as she did in the trial court, that because, as he testified, Dr. Gardner had read Dr. Hooker's deposition in preparation for the trial testimony in which he rendered an opinion, he could be cross-examined pursuant to Evid.R 703 and Evid.R. 705 with respect to the statements Dr. Hooker made in her deposition.
 {¶ 92} The trial court rejected the argument and sustained Defendant's objection to Plaintiff's use of Dr. Hooker's deposition, relying on the holding of the Third District Court of Appeals in Freshwater v. Scheidt (June 3, 1997), Paulding App. No. 11-96-10, that the deposition of one physician may not be used to impeach another physician. With respect to Plaintiff's contention concerning Evid.R. 703 and Evid.R. 705, the court found that "in order to make that type of argument persuasively, there must be testimony that the witness testifying relied on those materials in forming an opinion. That's not the case here. The objection is sustained." (T. 851).
 {¶ 93} As it happens, the decision of the Third District on which the trial court relied was subsequently reversed by the Supreme Court. See Freshwater v. Scheidt, 86 Ohio St.3d 260,1999-Ohio-161, in which the court held:
 {¶ 94} "If an expert witness relies upon published medical literature in forming his or her opinion, or the expert provides testimony sufficient to establish that the literature is reliable authority, or the literature is part of the expert's own publication, statements contained in the literature can be used for purposes of impeachment. The requisite reliance upon published medical literature or its authoritative nature can be established without an express acknowledgement by the testifying expert that he or she had relied upon the literature or that it is authoritative." Id., Syllabus by the Court.
 {¶ 95} Though it reversed the appellate court, the Supreme Court's holding in Freshwater offers Plaintiff no benefit. The Court emphasized that it was concerned with an expert witness's reliance upon "published medical literature in forming his or her opinion," literature which is "reliable authority, or . . . literature (which is) a part of the expert's own publication."Id., at p. 269. Such matters are encompassed by Evid.R. 706, which governs use of learned treatises for impeachment. The deposition statements of another physician do not constitute such authority.
 {¶ 96} We have held, however, that where an expert witness testifies that he based his opinion on the opinion of another expert who is deceased, a letter sent to the witness in which the deceased expert stated the opinion may be used to cross-examine the testifying expert by proof of a contradiction. Gilbert v.McKenzie (Nov. 3, 2000), Montgomery App. No. 18140. We expressly relied on Evid.R. 705 in so holding.
 {¶ 97} "Evid.R. 705 sets forth the procedure governing the disclosure of the facts or data used by an expert in formulating his or her opinion. Under the Rule, the expert must identify the facts or data underpinning his or her opinion prior to rendering that opinion." Weissenberger's Ohio Evidence, Treatise (2000), Section 705.1, at 347.
 {¶ 98} Unlike in Gilbert v. McKenzie, Dr. Gardner did not testify that he formulated any opinion he related or that he based any fact to which he testified on what Dr. Hooker had said in her deposition. He merely acknowledged that he read her deposition along with other materials pertaining to the case in preparing for his trial testimony. We agree with the trial court that the nexus of the witness's reliance on facts or data is not shown with respect to Dr. Gardner's testimony and Dr. Hooker's deposition. Therefore, Evid.R. 705 offers no basis on which to cross-examine Dr. Gardner concerning the statements Dr. Hooker made.
 {¶ 99} Evid.R. 703 contemplates two sources of facts or data on which an expert witness may base an opinion. When an expert has personal knowledge of the facts or data underlying his opinion, the personal knowledge is a permissible predicate for his or her testimony. Marshall v. Plainville IGA (1994),98 Ohio App.3d 473. When the expert lacks personal knowledge of the operative facts or data of the case, the only permissible source from which those foundational matters may be derived is the body of facts or data already "admitted in evidence at the hearing." Evid.R. 703.
 {¶ 100} Dr. Hooker's deposition and the statements she made in it had not been admitted in evidence when Plaintiff attempted to use them to cross-examine Dr. Gardner. Therefore, Evid.R. 703 offers no basis to find that they were within the scope of cross-examination authorized by Evid.R 611(B). Further, there is no sufficient basis to find that Dr. Gardner based an opinion or an inference on the statements Dr. Hooker made in her deposition, likewise excepting them from the application of Evid.R 703. Indeed, a review of his testimony shows that he relied on his own perception of the facts and not the opinion of any other person.
 {¶ 101} The third assignment of error is overruled.
 Defendant Gardner's Cross-Appeal FIRST ASSIGNMENT OF ERROR
 {¶ 102} "THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR DIRECTED VERDICT, PERMITTING THE CASE TO GO TO THE JURY TO CONSIDER WHOLLY INCOMPETENT TESTIMONY ON LIABILITY BY APPELLANT'S EXPERT WITNESSES."
SECOND ASSIGNMENT OF ERROR
 {¶ 103} "THE TRIAL COURT ERRED IN LIMITING TESTIMONY BY DEFENSE EXPERT DR. ARNOLD AND REFUSING TO INSTRUCT THE JURY ON INTERVENING, SUPERSEDING CAUSE."
THIRD ASSIGNMENT OF ERROR
 {¶ 104} "THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY BY DEFENSE EXPERT DR. PAUL."
FOURTH ASSIGNMENT OF ERROR
 {¶ 105} "THE TRIAL COURT ERRED IN ALLOWING BEDARD TO USE AS EVIDENCE THE `PHOENIX MAGAZINE.'"
FIFTH ASSIGNMENT OF ERROR
 {¶ 106} "THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF MEDICAL BILLS NOT PAID BY BEDARD."
SIXTH ASSIGNMENT OF ERROR
 {¶ 107} "THE TRIAL COURT ERRED IN ALLOWING A CLAIM FOR FUTURE DAMAGES WITH NO LIFE TABLE AND IN ALLOWING APPELLANT TO REOPEN HER CASE."
 {¶ 108} At oral argument, Defendant conceded that the errors he assigns would be rendered moot should we overrule Plaintiff's assignments of error. We have, and we agree. Therefore, pursuant to App.R. 12(A)(1)(c), we decline to rule on Defendant's cross-assignments of error.
 Conclusion {¶ 109} Having overruled Plaintiff-Appellant's assignments of error, we will affirm the judgment of the trial court.
Wolff, J. And Fain, J., concur.