[Cite as *Moraine v. Green*, 2021-Ohio-869.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| CITY OF MORAINE | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28883 |
| | : | |
| v. | : | Trial Court Case No. 2020-TRD-1538 |
| | : | |
| SHCONYA K. GREEN | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of March, 2021.

. . . . . . . . . . .

KENT J. DEPOORTER, Atty. Reg. No. 0058487, 7501 Paragon Road, Dayton, Ohio 45459
    Attorney for Plaintiff-Appellee

ANTHONY S. VANNOY, Atty. Reg. No. 0067052, 2621 Dryden Road, Suite 306, Dayton, Ohio 45439
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Shconya Green was convicted after a bench trial in the Kettering Municipal Court of reckless operation of a motor vehicle, in violation of Moraine Codified Ordinance 333.09(b), a fourth-degree misdemeanor. Green appeals from her conviction, claiming that it was against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed. However, the matter will be remanded to the trial court for the limited purpose of correcting a typographical error in the judgment entry.

## I. Facts and Procedural History

**{¶ 2}** The reckless operation charge stems from an incident in the school bus drop-off area of C.F. Holliday Elementary School involving cars driven by Green and another parent, Ms. Sledge. The City of Moraine's evidence established the following facts.

**{¶ 3}** Marissa Yeakley and Cassie Jordan, both teachers at the school, have front door bus duty in the mornings and afternoons. In the morning, this entails monitoring the eight buses that arrive at the school, helping the children get off the bus, speaking with parents who drop off their children, and letting tardy children into the school. Buses pull up parallel to the curb in front of the school to drop off the children. The bus lane is a only one-lane, but it is the width of two cars.

**{¶ 4}** From 8:30 to 8:45 a.m., cars are supposed to use a separate entrance on the opposite side of the school, but not all parents comply. In addition, cars that do come in the bus lane are not supposed to go around the buses, but that also is sometimes an issue. Children who walk to school are encouraged to use a sidewalk away from this area, but some parents park in the parking area by the bus lane and walk their children

up to the school.

{¶ 5} On January 6, 2020, Yeakley and Jordan were outside on bus duty when two cars that frequently use the bus lane arrived. Green was driving the car in front, and Sledge was driving a white car behind her. After both parents dropped off their children, Sledge's vehicle "went around Miss Green's car and kind of accelerated rather fast to get around her." In response, Green "floored it," and the two vehicles "jockeyed for position" as they headed for the stop sign at the end of the bus lane. Near the stop sign, Green veered to the left and hit the right rear bumper of Sledge's vehicle. Sledge got out of her vehicle, said something to Green, made an obscene gesture toward her, and then drove away. Green pulled into a parking space and called the police.

{¶ 6} Both teachers testified that the drivers had acted aggressively and had driven faster than appropriate. Yeakley and Jordan both estimated the distance from where Green had dropped off her children to the stop sign as approximately four car lengths. After the incident, they informed the school's principal about what had occurred.

{¶ 7} Moraine Police Officer Jerome Klemmensen responded to the school on a report of a motor vehicle crash. The officer spoke with Green in the school parking lot; Sledge was not there. Green reported to the officer that as she was leaving from dropping off her children, Sledge pulled in front of her and she (Green) hit the back of Sledge's car. Klemmensen looked at Green's vehicle but did not see any damage.

{¶ 8} Officer Klemmensen subsequently made contact with Sledge at her residence. Sledge told him that no contact had occurred between the vehicles and she had felt no need to stay at the school. Klemmensen obtained a written statement from Sledge and looked at her vehicle; the officer did not see any damage on her vehicle either.

Klemmensen completed his report and submitted it to Sergeant Keghan for processing.

{¶ 9} After Green obtained a copy of the police report and spoke with Sergeant Keghan, Officer Klemmensen was instructed to do a more thorough investigation, which included completing Form OH1 (Traffic Crash Report) and interviewing witnesses, Yeakley and Jordan. Both teachers provided him with written statements. The officer also spoke again with Green. As a result of the investigation, both Sledge and Green were charged with reckless operation.

{¶ 10} The matter against Green proceeded to a bench trial, during which Yeakley, Jordan, and Officer Klemmensen testified for the City. Green testified on her own behalf and denied that she had driven recklessly. At the conclusion of the trial, the court orally found Green guilty of reckless operation. The trial court imposed ten days in jail, all of which were suspended, a fine of $125, and court costs. The court subsequently filed a written judgment entry consistent with that sentence.

{¶ 11} Green appeals from her conviction.

## II. Manifest Weight of the Evidence

{¶ 1} In her sole assignment of error, Green claims that her conviction was against the manifest weight of the evidence. She argues that Sledge was the aggressor who drove recklessly. Green further asserts that, under "the physical facts rule," the trial court should not have credited testimony that she was driving much faster than appropriate. Specifically, Green argues that she could not have been speeding and jockeying for position given the short distance and timeframe described by Yeakley and Jordan.

{¶ 2} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more

believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact "clearly lost its way and created such a manifest miscarriage of justice" that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 3} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 4} Green was charged with violating Moraine Codified Ordinance 333.09(b). That ordinance provides: "No person shall operate a vehicle on any public or private property other than streets or highways, without due regard for the safety of persons or property." The ordinance makes an exception for the competitive operation of vehicles with the property owner's permission, but that exception does not apply in this instance. Moraine Codified Ordinance 333.09(c) defines "reckless operation" to mean "the

operation of a vehicle without the degree of care as a reasonably prudent person would have under similar circumstances."

{¶ 5} Here, both Yeakley's and Jordan's testimony supported a conclusion that Green committed reckless operation, as charged. According to Yeakley, after the children exited both vehicles, Sledge's car "went around Miss Green's car and kind of accelerated rather fast to get around her." Yeakley testified: "And at that time, Miss Green accelerated as well and they kind of did this side-by-side battle, if you will um, to get to the stop sign that's right there at the end of our drive." (Tr. at 8-9.) Yeakley elaborated that Green "floored it" in response to Sledge's actions, and "it was literally a back and forth" between the two vehicles with the lead car changing two or three times. Yeakley characterized Green's response as aggressive and not appropriate. Both cars were driving much faster than they should have been.

{¶ 6} Yeakley testified that she then heard a "crunch" as Green's car "kind of scooted towards the other car" in Sledge's lane of travel. At that point, Sledge got out of her vehicle, said something to Green, made a gesture toward her, and then drove off. Yeakley saw Green pull into a parking space. A parent walking by commented to Yeakley, "That's a lot of road rage right there." (Tr. at 9.)

{¶ 7} Jordan described the event similarly. She testified that, after the children got out of their parents' cars, the white car pulled away and started to move around the driver's side of Green's vehicle. Green then also started to pull away, and the two cars "jockeyed for position." The car driven by Green then appeared to turn into the other vehicle's back bumper. The other parent then got out of her car, "flipped Miss Green off," got back in her car, and drove away.

{¶ 8} Jordan stated that she was watching the vehicles, "because it was unsafe for the kids who were still walking into the building." (Tr. 28.) She testified that the drivers' behavior appeared to be like road rage, and she did not find it appropriate. She indicated that the cars were not going "super-fast," but they also were going "faster than they should have in that space." (Tr. 45.) Jordan saw Green at the school within a week of the incident, and Green commented about it to her. Jordan did not recall what Green said, but she (Jordan) responded, "Yeah, that was crazy."

{¶ 9} Both Yeakley and Jordan acknowledged on cross-examination that they did not know if Green saw the white car pull out from behind her. Jordan testified that she did not observe Green use expletives or obscene gestures toward the other driver.

{¶ 10} Green provided a different version of the events leading to the alleged collision. She testified that after her children exited her vehicle, she watched them walk to where Yeakley and Jordan were standing. She then pulled away from the curb. Green indicated that she did not see anyone beside her as she prepared to pull out. Green then saw "what appeared like a flash because that's how quickly this vehicle appeared." (Tr. 60.) She stated that, once the other vehicle was in front of her, she hit the vehicle with the front of her car. Green testified that Sledge exited her vehicle, called her some names, made an obscene gesture toward her, and then drove off. Green tried to get her composure and then pulled into a parking space to call the police. Upon looking at her vehicle, Green also did not see any damage.

{¶ 11} During her testimony, Green denied that she had fought for position with the other driver or that she even saw Sledge's vehicle before the collision took place. She asserted that there was not enough time and distance from her original position to the

stop sign for jockeying to occur. Green stated that she drove a smart car, which cannot accelerate at a high rate of speed. Green further testified that she called the police because she thought that Sledge "needed to be checked on." Green stated that she loves her children and other people's children and would never do anything to jeopardize any child's safety.

{¶ 12} Green argues on appeal that Jordan's and Yeakley's testimony differed in terms of how fast the vehicles were travelling. She also asserts that it "defies logic and physical laws of science" to conclude that she was speeding and jockeying for position with another vehicle. Green asks us to apply the "physical facts rule" to resolve these alleged conflicts in the testimony.

{¶ 13} The physical facts rule states that "the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value." *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 12, 326 N.E.2d 252 (1975). Consequently, a trier of fact "is not permitted to rest its verdict" on that testimony. *Id.*; *see Bedard v. Gardner*, 2d Dist. Montgomery No. 20430, 2005-Ohio-4196, ¶ 33.

{¶ 14} For the physical facts rule to apply, the "palpable untruthfulness" of the witness's testimony must be "(1) inherent in the rejected testimony, so that it contradicts itself or (2) irreconcilable with facts of which, under recognized rules, the court takes judicial knowledge or (3) is obviously inconsistent with, contradicted by, undisputed physical facts." *McDonald* at 12-13, quoting *Duling v. Burnett*, 22 Tenn.App. 522, 124 S.W.2d 294 (1938). "The issue is generally whether circumstantial evidence of physical facts is so conclusive as to wholly rebut oral testimony presenting a different version."

*Id.* at 14.

{¶ 15} *McDonald* provided several examples to illustrate the application of the physical facts rule. Addressing automobile accident cases, the Ohio Supreme Court noted that it is "generally agreed that estimates of the speed or location of movable objects are not physical facts," and thus the physical facts rule did not apply to estimates of time and speed. *Id.* at 13, citing *Hopfer v. Staudt*, 207 Or. 487, 492, 298 P.2d 186 (1956) ("The 'physical facts rule' cannot come into play with respect to the position, speed, etc., of movable objects, if facts relative to speed, position, etc., must be established by oral evidence or where it is necessary to make estimates or measurements or to start with an assumption of existence of a fact.").

{¶ 16} In light of *McDonald* and the evidence presented at trial, we conclude that the physical facts rule does not apply to this case. Yeakley and Jordan provided estimates of the distance from where Green dropped off her children to the stop sign. Neither Yeakley nor Jordan estimated the speed of Green's car. Yeakley testified that the speed limit on South Dixie Drive, where the school is located, is 20 mph and that she "assumed" parents typically drove approximately 5 to 10 mph when dropping off their children. Yeakley testified that Green and Sledge were driving "much faster than they should have." Jordan agreed that the cars were traveling faster than appropriate. This testimony does not qualify as evidence of physical facts within the meaning of the physical facts rule.

{¶ 17} Upon review of the evidence at trial, we cannot conclude that Green's conviction for reckless operation was against the manifest weight of the evidence. The City's evidence established that the driving incident occurred on elementary school

property in the bus drop-off lane while children were being dropped off for school. The two teachers who witnessed the incident saw Sledge rapidly pull out from behind Green's vehicle and Green respond by accelerating rapidly, too. The teachers indicated that the vehicles jockeyed for position as they headed toward the nearby stop sign. Both drivers acted aggressively, and the vehicles travelled faster than was appropriate for the time and location. The teachers saw Green veer into the back right corner of Sledge's vehicle. Green agreed that a collision occurred, although there was no apparent damage to either vehicle. In finding Green guilty of reckless operation, the trial court did not "lose its way" simply because it chose to believe the City's, rather than Green's, version of events. On this record, the trial court reasonably concluded that Green had recklessly operated her vehicle, in violation of Moraine Codified Ordinance 333.09(b).

{¶ 18} Green's assignment of error is overruled.

{¶ 19} We note that the trial court's judgment entry incorrectly states that Green was charged with violating "R.C. 333.09(A)." The traffic citation and accompanying statement of facts charged Green with violating Moraine Codified Ordinance 333.09(b). A review of the record reflects that the judgment entry's reference to R.C. 333.09(A) was a typographical error, which is subject to correction, pursuant to Crim.R. 36, by means of a nunc pro tunc entry. *State v. Hill*, 2d Dist. Montgomery No. 26581, 2015-Ohio-5166, ¶ 49 ("If a judgment entry misidentifies the offense due to a clerical error, that error may be corrected pursuant to Crim.R. 36.").

### III. Conclusion

{¶ 20} The trial court's judgment will be affirmed. The matter will be remanded to the trial court for the limited purpose of filing a nunc pro tunc entry, correcting its judgment

entry so that it reflects that Green was found guilty of violating Moraine Codified Ordinance 333.09(b).

. . . . . . . . . . . . .

TUCKER, P. J. and HALL, J., concur.

Copies sent to:

Kent J. DePoorter
Anthony S. VanNoy
Hon. Robert E. Messham, Jr., Sitting by Assignment